**CITY OF DALLAS v. MAXWELL et ux.**
**(No. 1800.)**

(Court of Civil Appeals of Texas. Amarillo. April 27, 1921. Rehearing Denied June 1, 1921.)

**1. Municipal corporations ⬤═796—City under duty to erect barriers at necessary points on streets.**

It is the duty of a city to erect railings or barriers along its streets at places where they are necessary to make the same safe for drivers in the use of ordinary care.

**2. Municipal corporations ⬤═819(4)—Evidence held sufficient to sustain finding city's negligence was proximate cause of jitney bus passenger's injury.**

In an action against a city for injuries to a jitney bus passenger, when the bus went off the street into a ravine, after hitting a telegraph pole, evidence held sufficient to sustain the jury's finding that the city's negligence in failing to erect a barrier at the point was the proximate cause of the accident and the injuries complained of.

**3. Municipal corporations ⬤═800(5)—City not relieved from liability to jitney bus passenger injured through its negligence and that of driver.**

The fact that the driver of a jitney bus was negligent in the operation of his vehicle, which negligence concurred with that of the city in not erecting a barrier at the particular point in causing the car to leave the street and plunge into a ravine, does not relieve the city of liability for injuries to a passenger, the driver's negligence, concurring with the negligence of the city, having been the proximate cause of the accident.

**4. Appeal and error ⬤═1050(1)—Error in admission of evidence rendered harmless by reception of other like evidence.**

Error in the admission of evidence was rendered harmless by the reception of evidence from other witnesses without objection tending to prove the same fact.

**5. Municipal corporations ⬤═796—Whether ravine into which jitney bus plunged private or municipal property immaterial.**

If it was the duty of a city to erect and maintain a barrier on a street at a point where a jitney bus left the street and plunged into a ravine, it is immaterial to the city's liability under the facts whether the ravine was private or municipal property.

**6. Damages ⬤═158(3) — Testimony of jitney bus passenger and physician as to injuries admissible.**

In an action against a city for injuries to a jitney bus passenger, when the car left the street and plunged into a ravine, testimony of the injured passenger, a woman, that the bones of her nose were broken, the roof of her mouth pushed up to the top of her nose, etc., held admissible, as was also the testimony of a medical witness to the same effect, plaintiff having sought to recover for mental anguish and suffering, the result of the disfiguring injuries which she described.

**7. Municipal corporations ⬤═819(7)—Evidence held to sustain finding jitney bus passenger did not appreciate dangers of use of street.**

In an action against a city by a jitney bus passenger, injured when the car left the street and plunged into a ravine, evidence held sufficient to sustain the jury's finding that plaintiff did not know or fully appreciate and understand the dangers incident to the use or attempted use of the street at the particular point by vehicular traffic.

**8. Trial ⬤═132—Opening statement of plaintiff's counsel informing jury as to effect of finding not reversible error where withdrawn.**

In an action against a city by a jitney bus passenger injured when the car left the street and plunged into a ravine, where, during the opening argument, plaintiff's counsel stated that the attorneys for defendant wanted the jury to say "Yes," and find plaintiff assumed the risk of riding in the jitney, and that he said they should answer the question "No," and not charge her with such risk, but, on objection, plaintiff's counsel withdrew the statement, there was no reversible error.

**9. Trial ⬤═114 — Counsel in argument may state how much plaintiff should recover.**

It is not improper for counsel in argument to state to the jury how much they think the plaintiff should recover.

**10. Damages ⬤═132(1) — $10,000 for severe physical injuries and disfigurement of married woman not excessive.**

A judgment for $10,575 recovered from a city by a jitney bus passenger, a married woman, injured when the car left the street at an unguarded point, and plunged into a ravine, subjecting her to severe physical injuries and disfigurement, held not excessive.

Appeal from District Court, Dallas County; W. F. Whitehurst, Judge.

Suit by B. G. Maxwell and wife against the City of Dallas. From judgment for plaintiffs, defendant appeals. Affirmed.

Jas. J. Collins, W. S. Bramlett, Allen Charlton, and Carl B. Callaway, all of Dallas, for appellant.

W. D. Cardwell, of Burkburnett, and McCutcheon & Church, of Dallas, for appellees.

HALL, J. Mrs. Laura Maxwell, joined by her husband, sued the appellant to recover $25,000 damages as the result of personal injuries charged to have been sustained by her by reason of the negligence of said city. It is alleged, in substance, that on or about December 9, 1916, she was a passenger in a motor bus, commonly known as a jitney, which was being operated along Carlisle street, in said city, and that, at the time of the accident which occasioned the injuries complained of, the bus was being driven at

---

⬤═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

a rate of speed not to exceed 15 miles an hour; that, several years prior to the above-named date, the city had built and constructed at the intersection of Carlisle and Vine streets a concrete or stone culvert, and had constructed, built, and maintained sidewalks and curbing along Carlisle street, at the intersection of Vine street, and that the construction of said culvert was on account of a deep ravine where Vine street ended; that defendant so constructed the culvert and fill in Vine street as to raise the intersection of said streets to the level of Carlisle street on each side of the ravine; that said city owned, maintained, and controlled the ravine where Vine street ended. It appears that Carlisle street runs approximately east and west at the place of the accident; that Vine street extended from the south ends at Carlisle street; and that, on the north side of Carlisle street, at the point where Vine street intersects it and ends, the ravine is approximately 50 feet deep.

Plaintiffs further allege that at all times since the construction of said fill, culvert, sidewalks, and curbs at and near the place, and for more than 24 hours prior to December 9, 1916, defendant had notice of the open and dangerous condition of the street, curb, sidewalks, fill, culvert, and ravine; that for a long time prior thereto said city had negligently and carelessly left said streets, curbs, sidewalks, culvert, fill, and ravine open and exposed, and had negligently and carelessly constructed and maintained the same in an open and exposed condition, to such an extent that said streets, sidewalks, culvert, fill, and ravine were openly and notoriously dangerous to persons and vehicles using said streets; that by the exercise of ordinary care the city could have made said place safe; that the mayor and city engineer knew of its dangerous condition, or by the exercise of ordinary care and diligence could have known, and by the use of ordinary care and diligence could and would have provided suitable curbs, guards, or rails to prevent accidents and injuries to persons and vehicles using said streets; that by failing to use such care the said city was negligent, and that its negligence was the proximate cause of the injuries sustained by the plaintiff, Mrs. Maxwell; that the city had permitted a large pole to be erected in said street near said gulch, which said pole was exposed, and not protected by any curbing; that on the west side of said Carlisle street, where Vine street ended, said ravine was from 40 to 50 feet deep, and extended almost to the width of Vine street; that the curb along the west side of said Carlisle street did not extend to a point even with the east line of Vine street, if extended, but only to within 8 or 10 feet of said east line; that there was no curb on the west side of Carlisle street opposite to where said Vine street ended, and no side-walk there save and except a string of three boards or planks, which were practically on a level with said streets; that from the west side of said board walk, and from 2 to 4 feet to the west of said walk, there was a precipice going down into said ravine which extended along the west side of Carlisle street, nearly the width of Vine street, and that said precipice was wholly unguarded, and without barriers, railing, or curb of any kind to prevent persons and vehicles from falling into said ravine; that at the intersection of said Vine and Carlisle streets, as aforesaid, the said city ordinarily maintains a street light, and at the hour of the accident, to wit, about 6:30 p. m. of said day, said street light was not burning, in consequence of which the streets were dark, and by reason thereof the driver of the motor bus could not and did not see said pole into which his motor bus ran, and on account of the failure of said city to have said lights burning, and on account of the negligence of said city in failing to construct and maintain a curb at that point, and its failure to construct and maintain a barrier to prevent said automobile from running into said ravine, its negligence was the proximate cause of the injuries; that when said motor bus came within a few feet of the east line of Vine street, and on the right-hand side of Carlisle street, the driver of said motor bus lost control of the vehicle, and the front part of the right-hand side of the bus struck the pole, which stood about 4 inches within the curb line of said street, swerved to the right, and, when it cleared said pole, it went over said board walk, down into the ravine, and turned over, thereby injuring the plaintiff, Mrs. Maxwell. She alleges her injuries to be as follows:

"That at the time of said accident Mrs. Maxwell was a strong, healthy, married woman, 30 years of age; that by reason of the accident she suffered the following injuries: Both the upper and lower jawbones were broken; her nose was mashed, bruised, and broken; some of her teeth were knocked out, and some broken off; the bone of her nose running to the base of the brain was broken and fractured, and on account of the breaking of said bones in her jaws and nose, and the breaking off and knocking out of her teeth, her face has been permanently disfigured, from which she has suffered great and excruciating physical pain and mental anguish; and said injuries are of a permanent nature, and she has, and will continue through her natural life, to suffer great physical pain and mental anguish, mortification, and humiliation; that her limbs were mashed and bruised and lacerated; her hips and spine were mashed, bruised, and made sore, from which she has suffered great physical pain and mental anguish; that she suffered internal injuries of the womb, ovaries, stomach, bowels, intestines, and female organs, which said injuries are permanent, and from which the said Mrs. Maxwell will suffer through her natural life, all to her damage in the sum of $20,000."

By trial amendment, plaintiffs pleaded actual notice to the mayor and city engineer of the city of Dallas of the defects in the streets causing the accident, alleging that said actual notice was given more than 24 hours prior to the accident. The city answered with a general demurrer, certain special exceptions, a general denial, a plea of assumed risk, contributory negligence, and interposed the two-year statute of limitations as to the claim for certain expenses.

The cause was submitted to a jury on special issues, in reply to which the jury found: (1) That the failure of the city in not having a sufficient and adequate guard or barrier along the north line of Carlisle street, at the place and time of the accident, was negligence; (2) that said negligence was the proximate cause of the accident and injuries complained of; (3) that the driver of the bus in which Mrs. Maxwell was riding was negligent in the operation of the vehicle; (4) that at and just prior to the accident the steering gear on the bus was so defective that the driver could not control and guide it; (5) that his negligence was not the proximate cause of the accident complained of; (6) that the negligence of the city, concurring with the negligence of the driver of the bus, was the proximate cause of the accident. In connection with the sixth special issue, the court charged the jury as follows:

"In passing upon the foregoing special issues, you are instructed that, by the term 'concurrent proximate cause,' as used in the above special issue, is meant such act as is wanting in ordinary care, which activity aided in producing the injury, and such act as might reasonably have been contemplated as involving the result under the circumstances."

The jury further found: (7) That, at the time she entered the jitney, Mrs. Maxwell did not know, fully appreciate, and understand the dangers incident to the use or attempted use by vehicular traffic of Carlisle street at its intersection with Vine street. Special issues 8, 9, and 10 relate to the amount of damages sustained. The trial resulted in a verdict for plaintiffs in the sum of $11,200, and interest from January 20, 1920, at 6 per cent. Plaintiff filed a remittitur of $625, and judgment was rendered against the city in the sum of $10,575.

The first error is assigned to the action of the court in refusing to direct a verdict for the city. Under this assignment appellant presents its first proposition, as follows:

"The alleged actionable negligence upon which appellees rest their cause of action are that: (1) There was no curb on the west side of Carlisle street, where Vine street ended; and (2) the ravine or precipice next to the west line of Carlisle street at the end of Vine street was unguarded. Viewed in the most favorable light for appellees, the evidence shows that appellant is not legally liable to appellees for the injury sustained by Mrs. Maxwell, due to the descension of the jitney into the ravine, notwithstanding the want of a curb and unguarded condition of the ravine and its proximity to the west or northwest line of Carlisle street, because: (a) Appellant owed appellees no duty to erect a barrier to prevent the jitney descending into the ravine; or, (b) to erect a barrier of such character as would have prevented the jitney, under the circumstances shown, from descending into the ravine; and (c) the alleged omission or omissions was or were not the proximate cause of the jitney descending into the ravine; hence, the peremptory instruction should have been given."

In reply to this proposition, which we suggest is, multifarious, the appellees submit the following counter proposition:

"It was the duty of the city of Dallas to use ordinary care to build and maintain its streets in a reasonably safe condition for the usual travel, and the failure of the city to erect guard rails or barriers to protect the traveling public from falling down a deep precipice or gulch, immediately adjacent to said street and sidewalk, is a question for the jury to pass upon as to whether the failure to erect said barriers or guard rails in each case is negligence, and whether said negligence is one of the proximate causes of the accident resulting from a motor bus being driven at a slow and lawful rate of speed, going over said precipice and seriously injuring plaintiff's wife."

Appellee also submits a second counter proposition, as follows:

"Where a municipal corporation opens up a street, such as the filling in of a gulch and the tearing down of a bridge over said gulch, and invites public travel, it must be made reasonably safe for such use, and if there is a dangerous place, such as a declivity, precipice, or ravine, so close to the street, or the traveled part thereof, whether on city property or private property, as to render it unsafe for travel, in the abuse of a barrier, constitutes a defect in the street, and the municipality is liable if the jury finds said failure to erect a barrier under the circumstances was negligence, and such negligence was the proximate cause of the accident."

Several plats were introduced in evidence —one showing, as before stated, that Carlisle street runs east and west at the point of the accident. Another was introduced by appellant, made by its engineer, which does not indicate the points of the compass, but from which we infer that Vine and Carlisle streets, as shown on that map, do not intersect each other at right angles, and for the purposes of this opinion we will treat them as running in the directions first above stated. That part of article XIV, § 11, of the city charter applicable to the case is:

"The city of Dallas shall never be liable on account of any damage or injury to person or property, arising from or occasioned by any defect in any public street, highway or ground of any public work of the city, unless the specific defect causing the damage or injury shall have been actually known to the mayor or city en-

gineer by personal inspection, for a period of at least twenty-four hours prior to the occurrence of the injury, or damage, unless the attention of the mayor or city engineer shall have been called thereto by notice thereof in writing at least twenty-four hours prior to the occurrence of the injury or damage, and proper diligence has not been used to rectify the defect after actually known or called to the attention of the mayor or city engineer, as aforesaid."

J. H. Lane, the driver of the bus, testified that he was 30 years old, married, and had been living in Dallas 5 years prior to the accident; that the route traveled by him was the regular one prescribed by the city for jitneys to operate over. He testified:

"I will say that I taken mine out on Carlisle, but there were some of them that went down the railroad, and on across the railroad to Cedar Springs, and some of us went out Carlisle to keep from crossing the railroad and pulling that hard hill. I had been engaged in driving a jitney at that time about 8 or 9 months, and was licensed by the city. I went from Austin to Akard on Elm street, and from Akard to Cedar Springs and from Cedar Springs to Carlisle; from Carlisle to Bowen, and out Oak Lawn, and returned the same route. I was permitted by the city, and those who had charge of the inspection of operation of jitneys and of their routes, to go over Carlisle street. Prior to the 9th of December I had been operating my jitney over Carlisle street about a month; had been transferred over there from Oak Cliff. I got the transfer from the city to this line which I have described. My car was inspected once a week by the jitney inspector. I recall the accident at Carlisle and Vine streets on December 9. It was about 6:30 o'clock in the evening. I was traveling in a southwestern direction; was coming to town on Carlisle. At the time there was a little boy in the front seat with me. The steering wheel or steering gear was on the left side, and I was seated on the left side of the front seat, and the boy on the right side. It was a five-passenger Ford. Besides the boy, as I found out later, I had Mrs. Holford and Mrs. Maxwell in the car. They got in the car at Sneed street. With reference to Vine street, Sneed is east one block; north and east of Carlisle and Vine. My automobile had a top on it at that time and I had side curtains. The top was up and the curtains were half up; that is, the curtains were up to the back seat where the ladies sat. I was not running very fast; don't think it could have possibly been over 8 or 10 miles an hour. I am familiar with the speed of such vehicles.

"When I stopped, and the ladies got in, one of the ladies, I don't know which, said, 'Let's fasten up these curtains; it is cold.' I didn't think it had been cold enough to put up the curtains. So I reached back with my left hand. My right hand, when I reached back with my left hand, was on the steering wheel, and I was sitting just like I am now, and reached back that way; was sitting with my face straight ahead, looking straight ahead on the street; don't think I ever turned in the seat. I just reached back and gave the curtains a jerk, and the lady said, 'I will fasten this,' and I says, 'All right.' Well, I seen that my car had cut to the right some; I don't know how it was, but it seemed like it wanted to go to the right all the time, and I tried to cut it to the left, and could not, and about that time I seen the pole, and it hit the pole in some way, I don't know just how, and then it sorter seemed like it was going the other way. It seemed like it sorter turned a little, and all at once it just turned where that ditch was, and I grabbed the emergency and tried to stop the car, but could not, and we went off then. It seemed like it was all done in a second. I remember the car hitting the pole, and up to that time we were pretty near off. The pole was located right near the curb. It was right at the edge of the ditch or the street gutter, just a little to the right of that. It is right across the street from Carlisle, where Vine street ends. The curb along there, up to that pole, or near the pole, is built up tolerably close to the pole, but there is a piece where there is no curb. I don't remember how many feet it is from the end of the curb to the pole. Could not say whether it was 10, 15, or 20 feet, but I know there is no curb where the pole is, where the car went off. The arc light at the intersection of Vine and Carlisle streets was not on at the time the accident happened. Along Carlisle street, on the right-hand side coming to the city, the way I was coming, there was no curbing. Before you get to Vine street there is a curb. As to the sidewalk, there was two planks, as well as I remember,. just two inch planks down there. I don't remember how wide they were, but not very wide. They were not on a very high incline. They were right on the ground.

"I stated a while ago that my machine kept trying to turn to the right. I later found the cause of that. I think my wheels had become toed, and caused the axle to tip forward, and the radius knuckle, the left knuckle on the radius rod, I think, broke. I used every effort in my power to steer my machine back into the street; tried to turn it to the left. I didn't know at that time why I could not do so. I knew something was wrong with the steering gear, but did not know what it was; it would not work. After the car struck the pole and went over the sidewalk, it went right off into that ditch. We measured from the top of the sidewalk down into that ravine where we fell, or where the car landed, and it was 48 feet. As my car went over the embankment, it turned bottom upwards. On that portion of it, if Vine street would be projected across to the north side of Carlisle, where there is a pencil mark there, there is no sidewalk. There is nothing but a board walk. There is not an elevation there to that sidewalk. After the accident I crawled out from down there under the car, and pulled the little boy out, and then ran around to the ladies, and hollered for help. Near the telephone post along where the curb line would come, it is about 3 or 4 feet in some places to where the bluff starts down. I could not say how near it is from the telephone post, because I don't remember exactly, but my recollection is I judge it to be 3 or 4 feet. There is a telephone pole in the board walk, two 12-inch boards there, then from this board it is about 6 or 8 inches in some places to where the precipice starts down. On this little diagram there used to be a bridge across here—banisters—old-

fashioned bridge, and they taken the bridge out and filled in there down to this gulch, and they never extended Vine street on across there. Underneath that bridge was this gulch; that gulch is what they filled in and made Vine street run into there. It has been a good long while since the bridge was there; I guess about 8 or 10 years since they filled that in. I lived about middle ways that block from where the accident took place. Would be, I guess, about 200 feet across from the house to the gulch. As my' car went over that embankment, it turned bottom upwards. It killed one lady, and injured the other. There were no guard rails or barriers, or anything to prevent the car from going into the ravine. It was dark about that time. I think I had my headlights on, but Ford lights are very dim—mine were."

Several photographs were introduced, showing the conditions surrounding the place of the accident. These views were taken from different points, and served to verify and illustrate the testimony of the several witnesses. B. G. Maxwell testified that the telephone pole on the north side of Carlisle street was just about on the curb line, and where the curb would be if it had been extended along the edge of the precipice made by the fill. He further testified that there was no gutter on that side of the fill. He admitted that the place of danger was open and visible, and its condition could be seen at all times, and stated that Carlisle street was at that time macadamized and graveled, and in that particular was in good condition for traveling. Mrs. Maxwell testified, in substance, that, at the time she and her sister-in-law, Mrs. Holford, entered the jitney to go to town, the wind was chilly, and only the back curtains of the jitney had been put up; that the curtain on her side of the vehicle was loose; that she said something about it, and the driver started to reach back to fasten it, and she told him to let it alone, that she would fasten it. She testified that he never did turn around, but reached his hand back for that purpose, and that was when she first entered the jitney. She says, just preceding the accident—

"it seemed like the car kinder jumped on the street a little bit, and the next thing I knew we were going into the ditch. From the boards the embankment slopes down gradually for a few feet, and then goes straight down;" that the last thing she remembered was that she was fixing the curtain.

John Van Wort, the third passenger, who occupied the front seat with the driver, testified in part:

"After the ladies got into the car, one of them complained about the wind blowing in through the curtains, and the curtain on the left-hand side car was flapping. I was seated on the right of the driver on the front seat. After this lady made that remark, the driver turned to fasten the curtain, using his left hand. The car was moving at about 10 or 15 miles an hour. Just about the time he turned around to fasten the curtain, and I think about the time he fastened it, we hit the telephone pole. The right-hand side of the car hit the pole and glanced off, and it threw the car around. When the car hit the telephone pole it threw the back end of the car to the left, and the car went right down the gutter. The driver put his left hand about like this, to fasten the curtain; then one of the ladies said: 'I will fix it,' and he brought his hand around and put it back to the front, and the lady started to fasten that curtain. I was turned around looking at the lady at the time. After the driver turned round the lady started to fix the curtain; then the car hit the post. That was my testimony on the former trial."

W. J. Powell, assistant city engineer, testified:

"There is a culvert under Carlisle street, and approximately on the south side of Vine street, which terminates in a retaining wall, a concrete retaining wall near the southwest line of Carlisle street, and the top of this wall is $9\frac{1}{2}$ feet from the floor line of the culvert. My recollection is that the top of the wall is approximately flush with the surface of the street to the bottom of the culvert, and it would be approximately $19\frac{1}{2}$ or 20 feet. From the top of that stone wall to the surface of the street is filled in with earth. All of that concrete wall is on Vine street, and is owned by the city."

J. G. Clardy, among other things, testified:

"That he lived near the scene of the accident, and went there immediately after the accident, and found Mrs. Holford dead and Mrs. Maxwell still breathing; that there was no light burning, and they could hardly see to get out; that the ravine or precipice is about 57 feet deep; that there is a two board plank walk along the west side of Carlisle street, but no sidewalk or curb; that the surface of the street was level, and the water ran over it; when it rained, the water from the street ran over the plank walk and down into the ravine; that it washed the dirt away all the time, and made the precipice come nearer the sidewalk; that at the time of the accident there were no boards there—no board sidewalk—just a little path across there."

S. B. Massie testified that during 1916, and a few years prior thereto, he was the city bridge man and foreman of district No. 2; that is, general foreman of the street bridge improvement work; that there is a cement sidewalk on both sides of what is supposed to be Vine street, through there down down that gulch; that for the convenience of pedestrians, school children, and so on, he built a wooden walk on across there by laying three 2x8 boards; that Ben Sira was the superintendent of this department at that time; that, when the street was first graded, there was a bridge where Carlisle first crosses Vine street; that prior to the accident he reported to Ben Sira about the precipice and gulch, and suggested that there should be a barricade, or a fence, or something at the top of the deep gulch, as it was almost straight down, as a good many

231 S.W.—28

children passed up and down that way, and that Sira would not let him do it; that a Mr. Alexander got up a petition to that end, and took it to the city hall prior to the accident, petitioning to have the ditch protected in some way.

C. L. Holford testified that on Monday morning, after his wife was killed Saturday night, the employees of the city came with a grader, and opened up a gutter across there but that this was after the accident. J. E. Lee, former commissioner of the city of Dallas, testified in part that he had, during 1911–1913 served as such commissioner, supervisor of streets, highways and bridges; that during that time he went out to the ravine; that the retaining wall was probably half way up to the street level, and probably 30 feet beyond the street line; that the storm sewer extended all the way under the retaining wall, and possibly 25 or 30 feet beyond it; that there were no barriers or guards above the surface of the street.

[1-3] In 13 R. C. L. p. 421, § 346, we find the rule stated as follows:

"It is well settled that it is the duty of a municipal or quasi municipal corporation to erect railings or barriers along the highway at places where they are necessary to make the same safe and convenient for travelers in the use of ordinary care, and that it is liable for injuries to travelers resulting from a breach of its duty in this regard. This is true though the danger arises from structures or excavations outside of the highway, and on the land of adjoining owners, when they are in the general direction of travel upon the highway. Whether or not a railing or barrier is necessary in a given case depends largely upon the circumstances of the particular locality in reference to which the question arises. Among the facts material to be considered are the character and amount of travel, the character of the road itself, its width and general construction, the direction of the road at the place, the length of the portion claimed to require a railing, whether the danger is concealed or obvious to the extent of the injury likely to occur therefrom."

The abstract question has been presented to the courts of this state in several cases, some of which are cited below, and the duty of the city to maintain barriers in the interest of travelers is generally declared, and the failure of the city to use reasonable diligence in the performance of this duty is invariably held to present a question of negligence for the determination of the jury. In some of the cases cited, the courts have reviewed the authorities at great length, and it would result in a needless extension of this opinion to quote from them. This case, as originally tried, was consolidated with the case of C. M. Holford against the city of Dallas, in which Holford sought to recover because of the death of his wife, who was in the jitney at the time of the accident. Rainey, Chief Justice, reversed and remanded the branch of the case now before us, and reversed and rendered the case in favor of the city upon the issue of Holford's right to recover. The rule quoted above, citing some of the cases hereinafter mentioned, is announced in this language:

"It is the duty of a city to see that its streets be made and maintained in a reasonably safe condition for use by the public, but as the statutes furnish no certain way a street is to be fixed, the court erred in charging that the failure to do certain things to make it safe for travel would be negligence. Where there is no statutory law stating what acts constitute negligence, the court should not assume that such acts are negligence. Whether such an act constituted negligence was a question of fact, which should be determined by the jury. * * *"

The evidence shows that Carlisle street, where the accident happened, was kept in good repair, except as to the gulch side of the street; and, as to that, there was no railing or barrier there to prevent travelers from leaving the street. Whether or not such absence of railing or barrier was negligence on appellant's part should have been submitted to the jury to determine, and not assumed by the court. The evidence quoted above is sufficient to sustain the finding of the jury that the city's negligence in failing to erect a barrier was the proximate cause of the accident and the injuries complained of; and the further finding that the driver of the bus was negligent in the operation of his vehicle does not relieve the city of liability, since the jury also found that his negligence, concurring with the negligence of the city, was such proximate cause. City of San Antonio v. Wildenstein, 49 Tex. Civ. App. 514, 109 S. W. 231; Gonzales v. City of Galveston, 84 Tex. 3, 19 S. W. 284, 31 Am. St. Rep. 17; Still v. City of Houston, 27 Tex. Civ. App. 447, 66 S. W. 76; City of Dallas v. McCullough, 95 S. W. 1121; City of San Antonio v. Porter, 24 Tex. Civ. App. 444, 59 S. W. 922; City of Ft. Worth v. Patterson, 196 S. W. 251; Eads v. City of Marshall, 29 S. W. 171.

The evidence, without reciting it here, shows that the appellant had all necessary notice of the defect and danger that its charter required of the injured party. The evidence shows that, while at the moment of the accident the steering gear of the jitney was defective, the driver had no previous knowledge of the defect; on the contrary, it is shown that his car had been duly inspected by the city authorities, as required by the city. By several assignments, appellant attacks the charge of the court upon various grounds. We have spent much time in a careful consideration of the criticisms made by appellant, and we have concluded that it fairly and fully presents the case as made by the pleadings and evidence. The substance of the issues asked and refused was

presented, though in somewhat different language, in the charge given by the court. It would needlessly prolong the opinion to discuss each of these assignments in detail.

The tenth and eleventh assignments are based upon the admission of certain testimony elicited from Mrs. Maxwell and her husband as to the extent of her female troubles. This was all objected to, upon the ground that no such injuries were included in the notice served upon the city. It is not necessary for us to decide as to the admissibility of this evidence, since it was withdrawn from the jury, and they were instructed to disregard evidence of all injuries not set up in the notice.

[4] The error, if any, in the admission of the evidence complained of under the twelfth assignment is made harmless by the reception of evidence tending to prove the same fact from other witnesses without objection.

[5] Even though it did not appear that the city had formally accepted the dedication of Vine street, as represented on the plots introduced over appellant's objection, no injury is shown by the thirteenth assignment. A pencil plot was introduced, and this, with the evidence of various witnesses, fully explained the situation at the place of the accident. If it was the duty of the city to erect and maintain a barrier at the point of the accident, it is immaterial under the facts whether the ravine was private or municipal property.

Mrs. Maxwell's injuries were described in the notice served upon the city, in part, as follows:

"Both her upper and lower jawbones were broken; her nose was broken; teeth knocked out and broken off, and her face and head were bruised and mashed in and lacerated; that said injuries are of a permanent nature, and will disfigure her face for life, and from said injuries she suffered great and excruciating pain, and on account of same will continue to suffer throughout her natural life, and that, by reason of said injuries, she will be disfigured for life, and on account thereof will suffer great mental anguish."

[6] By the fifteenth assignment it is urged that the court erred in permitting Mrs. Maxwell to testify that the bones of her nose were broken, the roof of her mouth was pushed up to the top of her nose, and the base of her nose was broken; that it was "just bursted open just like my chin; my nose was pushed back." We think this testimony was clearly admissible, as was also the testimony of Dr. Milliken to the same effect. During the argument, counsel for appellees said to the jury:

"Not only has she suffered these injuries, gentlemen, but she must go through life and to her final resting place suffering the mortification and humiliation of having people stare at her because of the injuries to her face and her deformed condition there. In my opinion—and this is just my opinion—if she got the whole amount she sued for, she would not be compensated for such humiliation."

We think this is proper argument. She sought to recover for mental anguish and suffering—the result of the injuries which she described, and which so disfigured her personal appearance. The mutilation of her face was described in the pleadings, and the facts were proven, by the unchallenged evidence of at least one witness. The shade of difference between the terms "mental suffering," "humiliation," and "mortification" is so dim that lexicographers have not been able to distinguish the one from the other. A physical deformity which is patent to observers may produce these things. As was said by Brady, Justice, in Texas Power & Light Co. v. Martin, 226 S. W. 451:

"The first question raised in the brief relates to the overruling of a special exception of appellant, and to the argument of counsel for the city as to mental anguish claimed to have been suffered by appellee because of his scarred and disfigured hand. The specific claim is that such sufferings are too remote to be the subject of compensation, and to constitute recoverable damages. This contention was considered by this court in the recent case of Texas Electric Railway v. Whitmore (decided April 14, 1920) 222 S. W. 644."

In the Whitmore Case, the question of mental suffering, or, in other words, humiliation and mortification, as the result of being scarred and disfigured, is discussed at length, and the affirmative of the proposition sustained. The holding in that case is fully sustained by many decisions in this state.

[7] By the nineteenth assignment it is contended that the answer of the jury to the seventh issue submitted to them, and in which they found that Mrs. Maxwell did not know, fully appreciate, and understand the dangers, if any there were, incident to the use or the attempted use of Carlisle street at that point by vehicular traffic, is not supported by the evidence. We cannot assent to this proposition. It is true that she had seen the place of the accident more than once, and with reasonable intelligence should have known that a vehicle leaving the line of the street would meet disaster with its occupants, but she is not bound to foresee and guard against defective vehicles, nor was it an exhibition of foolhardiness for her to take passage in a jitney which defendant's officers had not only licensed to pass the very spot where she was injured, but whose duty it was, by inspection, to provide against any defects in the vehicle. We think this presents the question of contributory negligence, rather than assumed risk.

[8, 9] During his opening argument, counsel for plaintiff said:

"They (the attorneys for the defendant) want you to say 'Yes,' and find that woman (pointing to Mrs. Maxwell) assumed the risk of riding in

that jitney, so that she will be deprived of her damages. I say you should answer the question 'No,' and not charge her with that risk."

The court's qualification of the bill shows that, upon objections by defendant's counsel, he further said:

"All right, gentlemen; if the defendant objects to that argument, I withdraw it, and ask you not to consider it, as I will present the issue in another way."

The courts are not in entire agreement upon the question presented by this, the twentieth assignment; some holding that it is highly improper for the jury to be informed by counsel in argument of the legal effect of their finding, but there is a consensus of opinion by the courts in this state that where the information conveyed is such that a jury, composed of reasonably intelligent men, would know the effect of any particular finding, it does not constitute reversible error, especially where the statement is withdrawn, either by counsel or by proper instruction of the court. G. H. & H. Ry. Co. v. Fleming, 203 S. W. 105; Rice v. Garrett, 194 S. W. 673, and authorities cited. Nor is it improper for counsel, in their argument, to state to the jury how much they think the plaintiff should recover. T. & B. V. Ry. Co. v. Dodd, 167 S. W. 238.

[10] The remaining assignments relate to the amount of the verdict. Appellee remitted certain items which were improper. In view of all the evidence, we are not prepared to say that the judgment is excessive. It is therefore affirmed.

---

⬤For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes