## CITY OF DALLAS v. MAXWELL et ux.
### (No. 325–3676.)

(Commission of Appeals of Texas, Section B March 7, 1923.)

**1. Municipal corporations ☞763(1)—Ordinary care required in construction and maintenance of highways.**

A municipality is charged with the duty of exercising ordinary care to so construct and maintain its public highways as to render them reasonably safe for ordinary travel, and a breach of that duty imposes legal liability for all damages which are thereby proximately caused.

**2. Negligence ☞59—What is actionable negligence.**

Anticipation of consequences is a necessary element in determining not only whether a particular act or omission is actionably negligent, but also whether the injury complained of is proximately caused by such act or omission; though actual anticipation is not the test, but what one should under the circumstances reasonably anticipate as consequences of his conduct.

**3. Negligence ☞10—Consequences which are to be anticipated.**

One should be charged with the duty to anticipate those consequences which, in the ordinary course of human experience, might reasonably be expected to result; the rule of anticipation or foreseeableness being one of practical application, and not of philosophical or metaphysical speculation on causation.

**4. Negligence ☞2—Relation of parties controlling factor.**

In determining the question of legal responsibility for a particular act or omission, the relation thereto of the injured party or of persons situated similarly or analogously to him is a controlling factor.

---

**5. Municipal corporations ☞762(1)—Liability of city for injuries in highways does not extend to consequences of extraordinary occurrences.**

The duty to construct and maintain streets and roads so as to render them reasonably safe for ordinary travel excludes liability for those consequences which arise from unusual or extraordinary occurrences.

**6. Municipal corporations ☞764(1)—Liability of city may extend to injury from conditions not located in street itself.**

A condition rendering a city liable to one injured while using a city street need not necessarily be confined to the street itself, but may arise by reason of its proximity to the street, which would render it not improbable that it would result in injury to those using the street in the ordinary manner and while exercising due care.

**7. Municipal corporations ☞800(5) — Negligence of driver of jitney no defense to action by passenger for injury.**

Negligence of the driver of a jitney is not a defense in an action by an injured passenger against a city for injuries received on the street.

**8. Municipal. corporations ☞800(1) — Injury from loss of control of automobile within domain of unusual and extraordinary.**

Where the injury to a traveler on a city street results from loss of entire control and direction of an animal or automobile, the occurrence falls within the domain of the unusual and extraordinary, and is therefore, in contemplation of law, of the unforeseeable, which the city, in the construction and maintenance of its highways, is not bound to anticipate.

**9. Municipal corporations ☞796 — City not negligent as to passenger in jitney for failure to erect barrier.**

It was not the duty of a city to erect and maintain a barrier on a street at a point where a jitney bus left the street and plunged into a ravine, something happening to the steering gear, the street being reasonably safe for ordinary travel by motor or other vehicle, notwithstanding that it was the duty of the city to erect such a barrier for the protection of pedestrians on the sidewalk.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Suit by B. G. Maxwell and wife against the City of Dallas. From a judgment of the Court of Civil Appeals (231 S. W. 429) affirming a judgment for plaintiffs, defendant brings error. Reversed and rendered.

Jas. J. Collins, Allen Charlton, W. S. Bramlett, and Carl B. Callaway, all of Dallas, and Chas. L. Black, of Austin, for plaintiff in error.

McCutcheon & Church, of Dallas, and W. D. Cardwell, of Burkburnette, for defendants in error.

McCLENDON, P. J. About 6:30 o'clock p. m. on December 19, 1916, a jitney car in which Mrs. Laura Maxwell and others were passengers, and which was traveling in a south or southwesterly direction on Carlisle street, in the City of Dallas, became unmanageable by reason of some defect in the steering gear, turned to the right across the sidewalk, and plunged into a deep ravine. One of the passengers was killed, and Mrs. Maxwell was seriously injured. This suit was brought by Mrs. Maxwell and her husband against the city to recover compensatory damages for Mrs. Maxwell's injuries; it being alleged that the city was negligent in not providing a barrier to prevent automobiles and other vehicles from falling into the ravine. The case was tried twice. On the first appeal it was remanded for new trial for error in the charge. (Tex. Civ. App.) 210 S. W. 725. The second trial was to a jury upon special issues; the jury finding, in addition to the amount of damages, in substance the following: (1) That the city's failure to have a "sufficient and adequate guard or barrier along the north or northwest line of Carlisle street at the place and time of the accident" was negligence; (2) that such negligence was the proximate cause of the injuries complained of; (3) that the jitney driver was negligent in operating the car; (4) that the steering gear of the car was defective, and the driver could not control or guide it; (5) that such negligence was not the sole proximate cause of the accident; (6) that the city's negligence, concurrently with that of the driver, was the proximate cause of the accident; and (7) that Mrs. Maxwell did not fully understand or appreciate the dangers incident to vehicular traffic on Carlisle street. Upon this verdict the trial court rendered judgment for plaintiffs, which was affirmed by the Court of Civil Appeals. 231 S. W. 429.

The accident occurred at the intersection of Carlisle and Vine streets. The south line of the latter forms a right angle with the east and west line of the former, while the east line of Vine street makes a slight angle with Carlisle street, so that in traveling south or southwest on the latter there is a slight curve to the right or west at the west line of Vine street. Vine street, although platted, appears never to have been used as a street, north of Carlisle, and is taken up entirely by a deep ravine. Formerly there was a bridge across this ravine; but some three or four years before the accident the city removed this bridge, placed a cement culvert or storm sewer at the bottom of the ravine, and filled in above it. Carlisle street was 50 feet wide between property lines, and had a sidewalk on either side about 5 feet wide, leaving about 40 feet of roadway in the center. This roadway was macadamized, sur-

faced with gravel, and was in good condition for travel by motor and other vehicles. On the west side of Carlisle street there were concrete curbings and cement footpaths up to the north and south lines of Vine street, leaving a break of about 50 feet with no curbing or cement walk. A board walk some 2 or three feet wide had been constructed to connect the cement walks. A few feet south of the end of the curbing at the north of Vine street was a light or telephone pole, which stood slightly west of the line of the curbing extended south. The board walk was west of the pole, and west of the board walk the ground sloped off rapidly, terminating in a 9-foot perpendicular retaining wall. The bottom of the ravine was some 40 or 50 feet lower than the surface of the street. There was some conflict in the evidence as to whether the sidewalk space across which the board walk extended was on a level with or slightly elevated above the gutter or drain adjoining the roadway; some of the witnesses testifying there was no elevation, while others, including Mr. Maxwell, gave an elevation of a few inches. This seems to be borne out by photographs introduced by plaintiff, which also clearly indicate that the ground west of the board walk began to slope at about where the property line would be, leaving about the usual 5 feet of sidewalk space to the curb line. The traveled part of the roadway began a foot or more from the curbing, thus leaving a space of 6 or more feet between the traveled part of the road and the point of danger. No character of guard or barrier had been constructed to prevent those using the street from precipitation down the incline and into the ravine. About 300 feet north of Vine street Carlisle intersects Sneed street. The jitney driver was traveling south on the west side of Carlisle street. He was familiar with the road, and had traveled it many times daily on his regular route for about a month. Mrs. Maxwell and a lady companion boarded the car as passengers at Sneed street. They occupied the rear seat, Mrs. Maxwell being on the left. The driver was on the left side of the front seat, and by his side was another passenger. When the car neared the north line of Vine street, it veered to the right, struck the telephone pole, went around it, crossed the board walk, and plunged down the embankment to the bottom of the ravine. There is no material controversy as to the manner in which the accident happened. A fair presentation of it is given in the following extracts from the driver's testimony:

'I recall an accident at Carlisle and Vine streets on December 9, 1916, that was about 6:30 o'clock in the evening. I was traveling in a southwestern direction. I was coming to town on Carlisle just prior to this accident. The jitney at the time—there was a little boy in the front seat with me. * * * That car,

the steering wheel or steering gear was on the left side, and I was seated in the left side of the front seat, and the boy was seated on the right side by me, in the front seat. That was a five-passenger Ford. Then besides the boy and I there was in the car, I found out later, Mrs. Holford and Mrs. Maxwell. * * * My automobile had a top on it at that time and I had side curtains. The top was up and the curtains half up; the curtains were up to the back seat where the ladies sat. * * * As to how fast I was running between Sneed street and Vine street just before this accident, I can't tell just how fast I was running, but I know I wasn't running very fast; I don't think I could have been possibly been making over 8 or 10 miles an hour—not over 8 miles or 10. From my experience of a motorbus or jitney I am familiar with the speed of such vehicles. In my opinion, between Vine and Sneed streets before this accident occurred I do not think I was going over 8 miles, if that much. * * * When I stopped and the ladies got in, one of the ladies, I don't know which one, one said, 'Let's fasten up these curtains; it is cold.' Well, I didn't think it had been cold enough to put up the curtains, and that is the reason I had them fixed up so they would protect the passengers in the back seat, just the front part coming up; so I reached back—I just reached back that way with my left hand; my right hand, when I reached back with my left hand, was on the steering wheel, and I was sitting just like I am now and reached back that way. I was sitting just like I am now and reached back that way. I was sitting with my face straight ahead, looking straight ahead on the street. I don't think I ever turned in the seat, but I just reached back and gave the curtains a jerk, and I saw it was not fastened in some way, and the lady said, 'I will fasten this,' and I says, 'All right.' Well, I seen that my car had cut—cut to the right some. I don't know how it was, but it seemed like it wanted to go to the right all the time, and I tried to cut it to the left and couldn't; and about that time I seen the pole, and it hit the pole in some way, I don't know just how it hit the pole, and then it sorter seemed like it was going the other way, it seemed like it sorter turned a little, and all at once it just turned, and I seen where that ditch was, and I grabbed the emergency and tried to stop the car, but couldn't, and we went off then. It seemed like it was all done in a second. I remember the car hitting the pole, and up to that time we were pretty near off. * * * The pole was located right near the curb, it seemed like; it was right at the edge of the ditch like, or the gutter, the street gutter, just a little to the right of that. * * * I stated while ago that my machine kept trying to turn to the right. I later found the cause of that. I think my wheels had become toed and caused the axle to tip forward, and the radius knuckle, the left knuckle on the radius rod, I think, broke. * * * At the time I struck this pole I was trying to cut my car to the left, at that time. I was trying to cut the car to the left with the steering wheel. I was trying to turn the steering wheel, using both hands, in an effort to cut the car to the left. That steering gear wouldn't work; it wouldn't cut to the left; my steering gear was loose.

After the car struck this pole and went over the sidewalk it went right off into that ditch."

[1] The general rule is that a municipality is charged with the duty of exercising ordinary care to so construct and maintain its public highways as to render them reasonably safe for ordinary travel. A breach of that duty imposes legal liability for all damages which are thereby proximately caused.

[2, 3] In this state it is now a settled doctrine that anticipation of consequences is a necessary element in determining not only whether a particular act or omission is actionably negligent, but also whether the injury complained of is proximately caused by such act or omission. Seale v. Railway, 65 Tex. 274, 57 Am. Rep. 602; Railway v. Bigham, 90 Tex. 223, 38 S. W. 162; Railway v. Bennett, 110 Tex. 270, 219 S. W. 197; Railway v. Behne (Tex. Com. App.) 231 S. W. 354. This doctrine is the result of an effort by the courts to avoid as far as possible the metaphysical and philosophical niceties in the age-old discussion of causation, and to lay down a rule of general application which will, as nearly as may be done by a general rule, apply a practical test, the test of common experience, to human conduct when determining legal rights and legal liability. Actual anticipation is of course not in any sense the test; but what one should under the circumstances reasonably anticipate as consequences of his conduct. And—

"When it is found that a man ought to have foreseen in a general way consequences of a certain kind, it will not avail him to say that he could not see the precise course or the full extent of the consequences, being of that kind, which in fact have happened." Sir Frederick Pollock in "Liability for Consequences," 38 L. Q. R. 165 (1922).

Human beings in their common dealings with each other in society should be required to exercise some degree of deliberation or forethought. It would . be unreasonable to require them, before doing or refraining from doing a particular act, to exhaust the field of speculation concerning every possible or conceivable consequence which might result from their conduct. It is just that one should be charged with the duty to anticipate those consequences which in the ordinary course of human experience might reasonably be expected to result therefrom, and therefore that he should be held legally responsible for those consequences. On the other hand, as stated in the Bigham Case:

"It would seem that there is neither a legal nor a moral obligation to guard against that which cannot be foreseen, and under such circumstances the duty of foresight should not be arbitrarily imputed."

It is obvious that the expression "cannot be foreseen" was there used in a qualified, and not in an absolute, sense, as denoting "cannot be foreseen" in the light of common or ordinary experience. Manifestly the test of common experience would exclude that degree of prescience which would require resort to mere speculation in possibly conceivable results, as well as to "prophetic ken." Railway v. Bennett, supra. The rule of anticipation or foreseeableness is therefore one of practical application, and not of philosophical or metaphysical speculation in causation.

[4] It is well settled that, in determining the question of legal responsibility for a particular act or omission, the relation thereto of the injured party or of persons situated similarly, or perhaps more properly analogously, to him, is a controlling factor. Whether injury might result to some one whose relation to the act or omission is wholly dissimilar or unanalogous to that of the injured party is a purely abstract and immaterial question.

Carlisle street was used by the public generally, and the users employed it for a variety of purposes and in a variety of manners. For pedestrians a place was provided adjacent to the property line—the sidewalk space. This portion of the street was used by all classes of people, young and old. From the board walk to where the decline began was but a step; and it may be conceded that a jury would be warranted in finding that the city owed a duty to pedestrians, or at least to certain classes of them, to protect them from the danger of falling into the ravine. But, even so, it does not follow that a like duty existed toward those using a different portion of the street in an entirely different manner, and whose situation with relation to the unguarded ravine bore no reasonable analogy to that of pedestrians. In order to hold the city liable in the present instance, the evidence should warrant the conclusion that in the ordinary use of the street by motor vehicles some injury might reasonably be foreseen as a result of the unguarded ravine.

There is a large volume of adjudicated cases upon this general subject, and the decisions are by no means in entire harmony. It would not serve any useful purpose to attempt an extended review of these cases. An extensive digest of them may be found in the following notes: 13 L. R. A. (N. S.) 1219; 18 L. R. A. (N. S.) 1135; 20 L. R. A. (N. S.) 980; 37 L. R. A. (N. S.) 1158; 42 L. R. A. (N. S.) 267.

[5, 6] It is quite generally held that the duty to construct and maintain streets and roads so as to render them reasonably safe for ordinary travel excludes liability for those consequences which arise from unusual or extraordinary occurrences. These latter are held not reasonably to be anticipated or foreseen, and therefore no legal duty is imposed to guard against them. In the application of this doctrine it has been held in numerous

cases that slight deviations from the traveled roadway, or the sudden fright and momentary loss of control of an ordinarily safe horse or other animal, are not such unusual occurrences as should not as a matter of law be foreseen and guarded against, and that, where a condition exists which would render the street unsafe in the light of such occurrences, the duty rests upon the municipality to take reasonable precaution against injury which might ordinarily be expected to result therefrom. And such condition, to come within the purview of reasonable foresight, need not necessarily be confined to the street itself, but may arise by reason of its proximity to the street, which would render it not improbable that it would result in injury to those using the street in the ordinary manner and while exercising due care.

[7] We are not unmindful of the obvious fact that motor-driven vehicles do become defective and unmanageable, that horses and other animals become frightened and control over them is lost, and that drivers are sometimes negligent, and accidents more or less serious result. In a sense all such occurrences are foreseeable. But, when not brought about by some defects in the highway, they are not incident to ordinary travel, and do not happen as a result of the ordinary use of highways—that use for which they are designed. When and where they may happen and the attendant consequences are matters of the barest chance and purest speculation. If in contemplation of law they were foreseeable, and therefore to be guarded against, then no limitations could be set to mark the bounds of a city's duty in the construction and maintenance of its highways. These occurrences might take place anywhere at any time, and to impose liability for their harmful results would in effect make the municipality, an insurer of the traveler's safety. We have included negligence of the driver in this list of occurrences for the reason that such negligence is not a defense where the injured party is not the driver and not in such relation to him as to share in the responsibility for his negligence, as was the case in this suit. It may be urged that the question of anticipation of results is not involved in determining responsibility for the failure to guard against the consequences attendant upon occurrences of this character; that nonliability may very properly be denied on the ground that there is no breach of duty where the damage arises from an occurrence which is unusual, because it does not take place in the course of ordinary use of the highway, to which alone the city's duty is applicable. We do not care to argue this suggestion; we merely present it with the statement that the authorities, in reaching the conclusion of nonliability, quite generally hold that occurrences of this nature are unusual and extraordinary, and therefore are not to be anticipated or guarded against.

[8] The weight of authority, which to our mind is in accord with sound principles, is to the effect that, where the injury to the traveler results from loss of entire control and direction of an animal or machine, the occurrence falls within the domain of the unusual and extraordinary, and therefore, in contemplation of law, of the unforeseeable.. Of course, this holding has no application to those cases in which some defect in the street was a contributing cause toward rendering the animal or machine uncontrollable. The following are some of the recent cases which support this view: Corley v. Cobb Co., 21 Ga. App. .219, 93 S. E. 1015; Drake v. Cleveland, 101 Ohio St. 111, 127 N. E. 469; Briglia v. St. Paul, 134 Minn. 97, 158 N. W. 794, L. R. A. 1916F, 1216; Swain v. Spokane, 94 Wash. 616, 162 Pac. 991, L. R. A. 1917D, 754; Camp v. Allegheny County, 263 Pa. 276, 106 Atl. 314; Wessels v. Stevens County, 110 Wash. 196, 188 Pac. 490; Wasser v. North Hampton County, 249 Pa. 25, 94 Atl. 444, L. R. A. 1915F, 973; Harrodsburg v. Abram, 138 Ky. 157, 127 S. W. 758, 29 L. R. A. (N. S.) 199; Medema v. Hines (C. C. A.) 273 Fed. 52.

Brief quotations from some of these cases, showing the grounds upon which liability was denied, may be helpful in reaching a proper solution of the questions before us.

In the Georgia case plaintiff's horse became frightened and she lost complete control of it before reaching a long bridge which was not protected by guard rails. While crossing the bridge a bystander tried to intercept the runaway animal, and in doing so caused it to be precipitated off the side of the bridge. The court say:

"County authorities do not owe the general traveling public any duty to make their highways safe for unmanageable runaway horses. If this were not so, county authorities would be required to exercise extraordinary, rather than ordinary, care to prevent injuries on their highways or public roads. The duty of the county is to exercise *ordinary care to make its* public roads reasonably safe for reasonably safe road animals. In other words, the defendant's duty was simply to provide for the usual and ordinary risks of the travel. * * *

"From the testimony hereinbefore set forth, it is evident that the escape of the horse from the control of the party in charge, and the efforts of Robertson to stop the flight of said horse, constituted the efficient, direct, and proximate cause of the injuries complained of, for which no responsibility rested on the defendant. Or, to state it differently, the blind violence of the animal, acting without guidance or direction, became, in the course and order of incidents which ensued, the controlling and proximate cause of the injuries inflicted by the fall from the bridge. The court did not, therefore, err in nonsuiting the case."

In the Ohio case a two-horse delivery truck ran into an unguarded drain in the street. The horses had been left at the side of the curbing, and while there had become frightened and ran away. We quote from the decision:

"Taking the admitted facts in the light most favorable to the plaintiff, it must therefore be said that the accident resulted, not from a defect in the street, not from an unguarded nuisance in or immediately adjacent to the street, but from an uncontrollable, though perhaps nonculpable, departure from a public way, which, so far as appears, was reasonably safe for this team and those riding behind it as long as the team was under normal control. It was not under normal control, but uncontrollable, with no human agency directing or in a position to direct. The accident occurred, not as an incident to travel on a way provided for the purpose, but rather because of a blind and insensate departure from the course of travel. The situation was therefore not essentially different from that which would have existed if the plaintiff had been thrown from the truck upon its striking violently against the curb in a part of the street admittedly in perfect condition."

The facts in the Kentucky case are the same as in the Ohio case, except that in the former the runaway team collided with a fire engine left by the city at the side of a 54-foot roadway. The gist of the decision is contained in the following quotation:

"It may be conceded that there is respectable authority for holding the city liable under the circumstances detailed in this case; but we are of opinion that the great weight of authority, as well as of reason, sustains the theory that, if the city authorities provide and maintain a highway reasonably wide and reasonably safe for public travel in the ordinary way, they have discharged their whole duty to the public, and are not bound to anticipate the extraordinary exigency of runaway horses. Indeed, it would be difficult to provide against frightened animals injuring themselves while running away. If there was an excavation in the street, an ordinary barricade would not stop a frightened horse; nor would the ordinary signals of danger avail. It is considered sufficient if the city authorities give timely and reasonable warning of obstructions in the highway, so that the traveling public may see and avoid the danger created; but, of course, no sort of signals or warnings would avail in the case of a runaway horse, and therefore no ordinary provision for the safety of the traveling public would prevent it from injuring itself. It therefore seems to us sound doctrine that the city authorities are not bound to anticipate and provide against so extraordinary a danger as a runaway horse. The rule would, of course, be different if the fright of the horse was due to the negligence of the municipal authorities; and likewise it would be different if the highway where the injury occurred was in a dangerous condition for ordinary travel. In either of these cases the city would be liable, because the negligence of its officers would be the proximate cause of the injury; but, where the municipal authorities are in no wise responsible for the fright of the horse, the city is not responsible in damages for its subsequently injuring itself in unnecessarily running against an obstruction in the highway, if there be ample space for the ordinary use of the traveling public."

The Minnesota case is very similar in its facts to the present. Plaintiff's automobile, from some unknown cause, suddenly began to back and was precipitated over a cliff. The roadway was 26 feet wide with level ground on one side, and on the other a drain gutter 6 to 8 inches deep. Beyond this was a graveled sidewalk 6 feet wide, and immediately beyond this the cliff. It was held:

"The locality in this case was remote from the center of the city, but we take into account that the traffic was large. Taking this into account, we think the city was not remiss in any duty to plaintiff. The roadway was not narrow. Its width of 26 feet was ample. Beyond that the gutter and the walk afforded protection against any ordinary deviation from the traveled road. Deceased did not suffer from any casual or ordinary deviation from the roadway, nor do we think there was any danger of her doing so. The course of the car was extraordinary. Stopping on a slight grade about 100 feet from the bluff edge, it commenced to back, and it backed nearly straight and over the precipice. We think the city should not be required to anticipate such unusual occurrences or to guard against them. It provided a roadway safe for all ordinary hazards of travel, and in that we think it performed its full duty. The city was not negligent. These views are sustained by authority."

To the same general effect are the two Washington cases above. The former of these (Swain v. Spokane) presents in its facts a striking analogy to the case at bar. There the steering gear of an automobile, which was being driven from 7 to 10 miles an hour, became defective, and the car suddenly turned to the right, went over a curbing, across a sidewalk, and through a temporary board fence constructed by the city on top of a wall which constituted the end of a bridge. When the car struck the fence, it was going about one mile an hour. The court reasons as follows:

"In the case before us it is clear that, for all ordinary uses of the street reasonably to be anticipated, it was kept in a safe condition, and that, if appellants' car had been equally fit for its intended purpose, the accident would not have happened. The defect in the car itself was plainly the proximate cause of the injury. The breaking of the railing was a mere condition. It could not reasonably be anticipated that a car, by reason of its own defects, would be driven over the curb, across the walk for pedestrians, and through the wooden railing at the side of the street.

"To hold the municipality liable in such a case would be to make it an insurer against every accident on its streets—in effect an in-

surer of the tractability of every team and automobile driven on its streets. This exceeds the duty imposed upon a municipal corporation in relation to the care of its streets. The facts make a plain distinction between the cases above noticed and the one before us."

After reviewing a number of authorities from Washington and other states which the court held to be in harmony with its holding of nonliability, the court further say:

"In each of those cases, it is true, was involved the excessive force of a runaway team. Such a contingency, however, is no more extraordinary nor less to be anticipated than the eccentricities of an unmanageable automobile."

[9] We think the principles announced in these cases require a holding that the city is not liable in the present case. Whatever may have been the duty of the city toward pedestrians using the sidewalk adjacent to the ravine, we think there can be no question but that the street was reasonably safe for ordinary travel by motor or other vehicles. The roadway was 40 feet wide and in good condition. The slight curve to the right at the south side of Vine street would tend to cause travelers by vehicle to turn away from rather than towards the ravine, if, in fact it would have any effect at all upon such traffic. The street was practically level, and the driver was familiar with it. We do not think the situation was such as to require the city to erect any character of barrier as a protection to those traveling in vehicles upon the roadway; and especially do we not think such duty, if it had existed at all, could be extended to the character of barrier which would be necessary to stop an ungovernable automobile.

It may also be very properly said, in this connection, that it would be entering the field of doubtful speculation to attempt to determine whether a barrier sufficiently strong to prevent the car from falling into the ravine would not itself have wrecked the car and produced like injuries to those which Mrs. Maxwell suffered. But, aside from this, we think there was no duty to guard against the accident in question, and consequently no liability.

The breaking of the steering gear, and not the failure to erect a barrier, was the proximate cause of the injuries sued for, in our opinion. In fact, we think the lack of barrier was, in legal contemplation, not a cause at all, but merely a fortuitous condition.

We conclude, therefore, that the judgments of the district court and Court of Civil Appeals should be reversed, and judgment rendered in favor of the city of Dallas.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.