RICHARDSON v. DALLAS RY. & TER-
MINAL CO.

No. 2699.

Court of Civil Appeals of Texas. Waco.

Dec. 5, 1946.

Rehearing Denied Jan. 2, 1947.

Bailey & Milam and Tom S. Milam, all
of Dallas, for appellant.

Burford, Ryburn, Hincks & Ford and
Clarence A. Guittard, all of Dallas, for
appellee.

TIREY, Justice.

Anthony Richardson brought this suit in
the County Court of Dallas County against
Dallas Railway & Terminal Company for
injuries sustained by him in the nature of
burns which he alleged were proximately
caused by the negligence of defendant. The
court submitted the case to the jury and
the jury found substantially that the fail-
ure of the operator of the bus to warn
plaintiff that the radiator was hot was neg-
ligence; that such negligence was the
proximate cause of the injuries sustained
by plaintiff; that the operator of the bus
was negligent in permitting the plaintiff
to put water in the radiator, and that such
negligence was the proximate cause of
plaintiff's injuries; that the plaintiff's in-
juries were not the result of an unavoida-
ble accident; and the jury further acquit-
ted the plaintiff of all negligence. The
jury awarded plaintiff $750 as compensa-
tion for his injuries. The court overruled
plaintiff's motion for judgment and granted
defendant's motion for judgment non ob-
stante veredicto, and plaintiff has appealed.

The sole question here presented is
whether the trial court was correct in hold-

ing that an issue of fact was not presented by the evidence. On May 9, 1945, plaintiff was employed at a filling station located at Lover's Lane and Douglas Streets in the City of Dallas. On the afternoon of that day, James Edward Reeves, an employee of the defendant, was operating a bus in the line of his employment and drove his bus into the filling station for water for his radiator. Plaintiff approached Reeves to aid him and Reeves asked him if he had a rag with which to take off the radiator cap. Richardson replied that he had a screw driver and he stepped to the side of the bus and touched the radiator cap with the screw driver and the excessive steam in the radiator blew off the cap and water gushed forth and inflicted secondary burns on his face, arms, back and shoulders.

Plaintiff grounded his suit on the allegation that his injuries "resulted because of the negligence of the defendant's agent and servant on the occasion in question in failing to warn this plaintiff of the fact that the motor of said bus was excessively hot and the radiator was full of steam, and in permitting this plaintiff to undertake to put water in the radiator of said bus, knowing, or in the exercise of ordinary care, should have known these facts."

The pertinent testimony is without dispute. Plaintiff tendered Reeves, the operator of the bus, who was not in the employment of the defendant company at the time of the trial. Reeves testified substantially to the effect that he was on his regular route for the day; that the filling station was on this route; that he went to work about five o'clock in the afternoon of the day of the accident; that he stopped at the filling station to get some water for the radiator on his first trip; that the first time the bus was pretty warm and he noticed it "clattering a little bit once, ever once in awhile." "Q. It was clattering like a hot motor will do? A. Yes, it wasn't so awful hot, but I stopped and got water the first time out." At that time he took off the cap and put in the water; that after he put the water in the bus on his first trip he proceeded on his route and did not notice any more "clattering" of the bus; that he had been driving the bus constantly for about two hours at the time he drove up to the filling station the second time for some more water for his radiator.

"Q. Well, what reason did you have for stopping there the second time? A. It was hot the first time that I went out, and I had a little layover out at the end of the line that particular trip out, and I thought it was best for everybody concerned, and the bus, to keep it up in shape, to stop and check the water, being as I had to lay over there in that little time left to do it, so I thought I would just get out and go check the water. * * *

"Q. Did you see Mr. Richardson come out to the bus? A. No.

"Q. Did you see him at any time before this incident happened? A. Yes.

"Q. When did you see him? A. Well, I got out of the bus and went around behind the bus to check the water, and as I go by the water hose, I pick it up, the best I could remember, and goes over there to service the bus to put water in it. Well, I reaches up to take the cap off the bus and I noticed it was warm, so I stepped back, and he, Mr. Richardson, must have been waiting on an automobile, there, had pulled up behind the bus, over at the side, and I asked him, did he have a rag there to take the cap off of the bus with, and he said he didn't, and so he said he had a screwdriver, and so he takes the hose and takes a screwdriver and goes up there to start to touch the cap, and it blew off.

"Q. He hadn't even lifted the cap up when it blew up, is that correct? A. He touched the cap with his screwdriver.

"Q. After that, the cap blew off, is that right? A. Yes. * * *

"Q. * * * now, Mr. Reeves, you didn't tell Mr. Richardson to be careful, that that radiator was liable to be hot, did you? A. No, I didn't.

"Q. And you knew from your previous experience that it might be hot, didn't you? A. No, I didn't have no reason to believe it was hot.

"Q. You checked it before and it was hot then, hadn't you? A. That is right, hot before.

"Q. And you had made another run, hadn't you? A. That is right.

"Q. And how long is your run, Mr. Reeves? A. It took in about an hour and fifteen minutes, I think, on that particular trip to make a round trip, if I am not mistaken, something like that.

"Q. And the bus had been running all that time? A. Since about 5:00 o'clock.

"Q. I mean on that last round you had; you speed up between stops don't you? A. That is right.

"Q. And you do a lot of stopping and starting, don't you? A. Yes. * * *

"Q. Now, at the time that Mr. Richardson took this screwdriver and touched the radiator cap, where was he standing? A. He was standing there right behind the bus under the radiator cap.

"Q. Was he right in front of it or over at the side? A. Yes, sir, he was practically in front of it.

"Q. You didn't tell him to stand back, that it might be hot? A. No, I didn't have time to say anything. I didn't know the bus was hot.

"Q. That is, you didn't tell him that though, did you? A. No, sir."

He further testified to the effect that Richardson did not come out to the bus on his first stop.

Plaintiff testified to the effect that he had been working at the filling station since last September a year ago; that he had been engaged in working at filling stations since 1934; that he was thirty-three years old.

"Q. Just tell * * * exactly what happened to you out there that day? A. Well, this bus, this University Park North, he came in there at the end of our driveway. He was going back to town, and he pulled across. He didn't pull up in the driveway. I don't guess he could have gotten in the inside driveway if he had tried, but he pulled across the end of the driveway where he could get to the water hose. Well, I went out there and I don't recollect whether there was a car on the outside drive or not, but I went out there and asked Jimmie Reeves something about the water, and he said, 'Give me some water', something to that effect, and I started to take the cap off of this bus, and I couldn't see any steam. It didn't seem to be that hot, but I did take precaution to take a screwdriver and punch at the cap, and when the cap barely moved, why this water came out there and hit me in the face, this side of the shoulder it first hit me, and I wheeled to run and it got my back and I just couldn't get out of the way of it. It must have 'geysered' out there. * * *

"Q. When the busses stop there for water, it is because they need water, isn't that right? A. I imagine so.

"Q. And when they need water, they are usually pretty hot, aren't they? A. Well, I expect they would be.

"Q. In fact, that is the reason they stop there for water because the busses are hot, isn't it? A. Well, that is what they put water in them for, is to keep them from getting hot. * * *

"Q. The first time you remember seeing Jimmy Reeves that day was just before this accident happened? A. Yes, sir.

"Q. Did you see him get out of the bus? A. Yes, sir, I did.

"Q. Just tell me just what he did when he got out of the bus? A. The best I remember, he got out of the bus and walked around at the back of the bus, and I walked out there. I was already out there. I don't remember exactly the way it was, but he went around and got the hose, and he said, 'Have you got a rag?' and I said, 'No, I don't think I have.' I said, 'I have got a screwdriver here.'

"Q. What did he want the rag for? A. I imagine to open the cap on the bus.

"Q. He was going to open it himself? A. I imagine he was. * * *

"Q. He didn't ask you to put water in, he just asked you for a rag, that is right isn't it? A. No, I wouldn't swear to that. It seemed kind of like he said, 'How about some water?' but I don't think he said those words, to put the water in.

"Q. And then he asked you for a rag? A. Yes, asked me if I had a rag in my pocket.

"Q. He never did actually say to you, 'Please put some water in this bus'? A. No, he didn't.

"Q. You tried to open the cap there with a screwdriver? A. Yes.

"Q. Why didn't you put your hand on it? A. Well, I didn't want to just reach up there and grab it off with my hand. I thought maybe it might be hot.

"Q. You thought it might be hot, and if you did that, it might burn your hand? A. Yes. * * *

"Q. Just how did you stand there as you tried to take the water, take the radiator cap off. A. Well, the bus was facing south, and I was, reached this hand out with the screwdriver, was kind of standing to the side, to the side of it like. I wasn't standing, the best I can remember, right in front of the cap, and I reached over to punch, and when it blew off, that is when it got this side of my face, and this arm, and when I wheeled to run, why, it got me in the back then.

"Q. Why didn't you stand in front of it? A. * * * I didn't want to get out right in front of it. I thought maybe if it boiled out, I would be right in front. * * *

"Q. And just as soon as you moved it a little bit, all the water and steam came out? A. Yes, sir, blew up.

"Q. Had you ever seen water come out of a radiator like that before in your eleven years' experience? A. No, sir, not like that.

"Q. You have seen steam come out of radiators? A. I have seen it boil over, yes.

"Q. When Mr. Reeves asked you for a rag, you knew what he wanted the rag for, didn't you? A. Not necessarily, no. * *

"Q. Did Mr. Reeves have the hose in his hand at the time he asked you for a rag? A. I don't much believe he did when he asked me for a rag.

"Q. But he had already said, 'How about some water?' A. Yes.

"Q. And you concluded from that that he didn't want to get his hands burned on the radiator cap, didn't you? A. Well, I figured probably that is what he wanted with the rag."

Did the trial court err in granting defendant's motion for judgment non obstante veredicto? In passing upon this question "it is our duty to disregard all conflicts in the testimony; to consider the evidence adduced in the case in the light most favorable to plaintiff, and to indulge in his favor every intendment reasonably deducible from the evidence. Anglin v. Cisco Mortgage Loan Co., 135 Tex. 188, 141 S.W.2d 935. When the facts are controverted, or such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only when the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. Wininger v. Fort Worth & D. C. R. Co., 105 Tex. 56, 143 S.W. 1150." James v. Missouri-Kansas Texas R. Co., Tex.Civ.App., 182 S.W.2d 921, 922, writ refused.

It appears from the pertinent testimony hereinabove quoted that the only information that the bus driver had as to the condition of the bus that Richardson didn't have was (1) that the bus had been in actual operation since five o'clock that afternoon. However, Richardson knew from his knowledge of the bus route that the bus had been in operation and was on its way back to town; the driver knew (2) that on his first trip the bus had been "clattering" and he knew from the sound it was making that it was hot, and it was that information that caused the bus driver to stop on his first trip by the filling station that afternoon and put water in the radiator. Richardson did not have that information. After the bus driver put water in the radiator on the first trip he testified to the effect that he heard no other sound in the motor that caused him to think it was hot, and on the second trip, at the time he reached the filling station, he stopped to see if he needed any water in his radiator because he "thought it was best for everybody concerned, and the bus, to keep it up in shape, to stop and check the water." It is clear from the bus driver's conduct that he did not anticipate any danger when he began to service the radiator for water, because when he reached "up to take the cap off I noticed it was warm so I stepped back," and he did not then try to remove the cap with his bare hand but asked Richardson for a rag. We think the only inference that could be drawn from

this evidence was that the bus driver anticipated no danger in removing the cap because the inference is obvious that he intended to try to remove the cap with a rag in his hand. The bus driver asked Richardson for a rag and Richardson replied that he did not have a rag but he had a screwdriver, and that he did not have time to say anything else to him before Richardson touched the radiator cap with the screwdriver, at which time the steam blew the cap off with the resulting burns and injuries to Richardson. The bus driver further testified to the effect that he did not have any reason to believe the radiator was hot. There is no evidence that the bus driver had ever seen a radiator boil over, but on the contrary Richardson in his eleven years of experience had seen radiators boil over and he took the precaution, under his own testimony, to stand to the side of the bus so as to be, as he thought, out of danger, but when he punched the radiator cap with the screwdriver the explosion was of such force that he had not anticipated the danger that he was in, nor is there the slightest evidence that the bus driver anticipated or could have reasonably foreseen such danger. Although the bus driver knew that he had been running the bus for two hours with frequent stops and starts, there is nothing in the evidence to indicate that such operation of the bus under the conditions it had been operated would cause the engine to get so warm that it would cause water to spout from the radiator with the removal of the radiator cap, nor is there evidence in the record that such an event had ever happened before. There is no evidence that the bus driver knew that hot water and steam would gush out of the radiator on the removal of the cap or that he had any reason to anticipate that such would happen. It is true that the bus driver had the information that the radiator cap was probably hot enough to burn his hand, otherwise he would not have asked Richardson for a rag; but when the bus driver asked Richardson for a rag, such request was sufficient to put Richardson on his guard that the radiator was hot, otherwise no such request would have been made of him. Richardson fully appreciated this informa-

tion and took what he thought was sufficient precaution by standing to the side of the bus and punching at the radiator cap with the screwdriver. The question then arises, was the bus driver negligent in failing to warn Richardson of the fact that the motor of said bus was excessively hot and that the radiator was full of steam? We think not. The bus driver was obligated to exercise ordinary care for his own safety as well as the safety of Richardson, of whom he had made a request, and this we think he did. The rule is "That anticipation of consequences is a necessary element in determining not only whether a particular act or omission is actionably negligent, but also whether the injury complained of is proximately caused by such act or omission. * * * Actual anticipation is of course not in any sense a test; but what one should under the circumstances reasonably anticipate as consequences of his conduct." City of Dallas v. Maxwell, Tex.Com.App., 248 S.W. 667, pts. 2, 3, page 670, 27 A.L.R. 927 (opinion adopted by S. Ct.). It is likewise well settled that "where there are conflicts in the testimony of different witnesses or contradictions in the testimony of a particular witness, or where the testimony is vague or the ultimate fact to be ascertained is not shown by direct testimony but is to be inferred in whole or in part from other circumstances in evidence, a jury question is presented." Sterling v. Community Natural Gas Co., Tex.Civ.App., 105 S.W.2d 776, pt. page 777. See also: Texas & Pac. Ry. Co. v. Bigham, 90 Tex. 223, 38 S.W. 162; 30 Tex. Jur. 665; Beard v. Chicago, M. & St. P. R. Co., 134 Minn. 162, 158 N.W. 815, L.R.A.1916F, 866.

Applying the foregoing rules to the undisputed evidence adduced, our view is that the bus driver could not foresee the accident in question and the resulting injuries to Richardson or a similar accident and resulting injuries to one attempting to put water in the radiator of the bus in the exercise of ordinary care and that there is no room for ordinary minds to differ as to the conclusions to be drawn from such evidence viewed in the light most favorable to the plaintiff Richardson. It follows that we are of the opinion that the fact issue

of actionable negligence was not raised by the evidence and that the trial court did not err in granting defendant's motion for judgment non obstante veredicto.

Accordingly, the judgment of the trial court is affirmed.