**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY OF TEXAS, Appellant,**

**v.**

**Jesse BRUTON, Appellee.**

**No. 12920.**

Court of Civil Appeals of Texas.

Galveston.

April 26, 1956.

Rehearing Denied May 17, 1956.

G. H. Penland, Dallas, Vinson, Elkins, Weems & Searls and C. E. Bryson and Ben H. Rice, III, Houston, for appellant.

Bonham, Stanley & Campbell, Helm, Jones, McDermott & Pletcher, and Albert P. Jones and Raymond L. McDermott, Houston, for appellee.

GANNON, Justice.

Suit under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by Jesse Bruton against Missouri-Kansas-Texas Railroad Company of Texas, his employer, to recover for personal injuries sustained on October 30, 1952; when a railroad motor car operated by Bruton, a section foreman, along a passing track on defendant's line near the Katy, Texas, depot in Harris County, Texas, ran into an open switch which was set closed to the passing track and open to a connecting rice mill industrial track.

Trial to a jury on special issues under the comparative negligence doctrine obtaining in actions under the Federal Act resulted in findings establishing primary and contributory negligence, damages of $33,000, and that plaintiff's negligence contributed to the accident 45%, compared to 55% caused by that of defendant. Judgment for plaintiff in the amount of $18,321.10 with interest and costs followed.

Defendant appeals, assigning by properly preserved points of error the want of any proof to show facts from which there could legitimately be inferred any breach of duty by defendant to plaintiff and that the record conclusively establishes plaintiff's own negligence as the sole proximate cause of his injuries. Other points of error go to procedural matters.

The issues may not be understood without a somewhat detailed outline of the facts. A plat of the area at the place of the accident was introduced in evidence. This makes the movements of the motor car and of the switching operation involved easy to follow, however because of the size of the plat it is impracticable to reproduce it in this opinion. We will, therefore, do our best to describe the salient facts.

All tracks involved run east and west. On the day of the accident defendant's local freight train No. 95 arrived at Katy from the west, destined for Houston. The train stopped on the main line track at some point west of the Katy, Texas, depot. The work to be done at Katy, Texas, consisted of coupling up some 15 cars, then spotted on the rice mill track, and then switching these cars through a certain passing track and onto the main line and attaching them to the body of the train where it stood on the main line track west of the depot. There are three principal tracks at Katy, namely the main line track, a lengthy passing track, and a less lengthy rice mill industry track. The three tracks are connected to each other by switches. All run east and west. The passing track lies to the north of and alongside the main track. The rice mill track in turn lies to the north of and alongside the passing track. The rice mill track is connected to the passing track by two switches only. These are described in the evidence by their geographical location as the west switch and the east switch. They are the only switches necessary to note in connection with the accident.

On the day of the accident Bruton and his section crew, consisting of Guzman, Collins and Simpson, had taken the motor car out of the tool house south of the main line track near the depot. They had been over Bruton's section from Mile Post 1056 to Mile Post 1066 and had returned to a point near the rice mill dryer. This is located a short distance from and to the north of the rice mill track. Collins and Simp-

son were engaged in picking up trash which had been kicked out by the dryer. The motor car had come into the area from the east on the passing track so as to be nearer the trash to be picked up. While Collins and Simpson were picking up trash, Bruton and Guzman were seated on the motor car, which had been stopped on the passing track opposite the rice dryer. Bruton observed the detached engine of Local 95 approaching him from the west on the passing track. Had Bruton left the motor car stationary, the engine proceeding from the west in an easterly direction on the passing track would have overtaken the motor car. Bruton knew from past experience that the engine was to do switching work on the rice mill track. Therefore, he and Guzman retreated with the motor car ahead of the approaching engine and well past the east switch to the rice mill track. The engine came ahead and also proceeded past and clear of the east switch connecting the passing track to the rice mill industrial track preparatory to going into the rice mill track through the east switch. However, it is important to note that as the engine passed the west switch Brakeman Thorne, who was riding the rear of the engine, dropped off at that point and immediately lined the west switch for the rice mill track and against the passing track. This was unknown to Bruton, nor was it suspected by him. There is proof from defendant's evidence that 99 times in 100 all switching by Local 95 to and from the rice mill track was done through the east switch. This is because 99 times in 100 only a portion of the cars on the mill track are loaded and ready to go out on the local train and it is impracticable in such circumstances to use the west switch, in separating the cars to go from those to remain and attaching them to the train. However, on October 30, 1952, all 15 cars on the mill track were to go out and be attached to the train and it was decided by the train crew member in charge to back the engine into the mill track through the east switch, then couple all the cars and back-shove the entire cut through the west switch onto the passing track and westward thereon and through a connecting switch to the main

line as a means of attaching the cut to the main body of the train. It was in anticipation of this unusual movement that Thorne dropped off of the engine as it passed the west switch while proceeding eastward on the passing track to the east switch. It was a convenience to Thorne and a time-saver for the crew to open the west switch when Thorne opened it. The cars to be coupled on the rice mill track were some distance to the east of the west switch. Thorne was to participate in the work of coupling these cars. Had he waited to open the switch until the cars on the rice mill track were coupled and attached to the engine and the *movement* of the cars through the switch was ready to be made, there would have been a delay while Thorne was walking back to the west switch-stand from his position at the cars, or had he ridden the cut down to the west switch there would have been a delay while he dropped off to open the switch and the cut of cars would have had to be stopped preparatory to making the movement through the switch.

Defendant's Operating Rule 104 governing the alignment of switches is as follows:

"Main track switches must be lined and locked for main track when not in use. Other than main track switches, equipped with switch locks, must be lined and locked for normal position when not in use. The following other than main track switches must be kept lined in a normal position *except while movement through them is being made:* Cross-over switches; switches connecting other tracks with the siding. Except as prescribed by Rule 402, main track switches must not be left open after movement through them is completed, unless attended by a member of the crew. A main track switch must not be left open for a following train or engine, unless in charge of a member of a crew of such train or engine or an assigned switch tender."

When the engine stopped on the passing track clear of the east switch to the rice mill track preparatory to going into the

rice mill track, Brakeman Richey got off the engine and lined the east switch for the engine to go into the rice mill track. Immediately upon so lining this switch, Brakeman Richey proceeded to the cars on the rice mill track. After the engine backed through the east switch onto the rice mill track, Fireman Yancey got off the engine and relined the east switch for the passing track and threw the derail to prevent the engine from coming back onto the passing track. Fireman Yancey agreed to do this in the interest of time so as to permit Brakeman Richey to get on with the work.

While the foregoing engine movement was being made, Bruton at all times kept the motor car on the passing track, a safe distance to the east of the engine. But when the engine stopped east of the east switch, Bruton stopped the motor car. After the engine got on the rice mill track and after Fireman Yancey relined the east switch for the passing track, Bruton came back on the motor car along the passing track and past the east switch to the rice mill track to the point where he had left Collins and Simpson picking up trash north of the passing track near the rice dryer. It was about quitting time. The work of picking up the trash had been completed and Collins and Simpson got back on the motor car. The entire section crew, Bruton, Guzman, Collins and Simpson, then commenced to proceed west on the motor car, intending to place it in the tool house and knock off work. When the motor car, which was then being operated by Bruton, reached the west switch, a derailment accident occurred. This was obviously because Bruton was not aware that the west switch was set closed to the passing track.

It is to be noted that as Bruton came back westward on the passing track from a point east of the east switch to pick up his men, Mr. Birdwell, the head brakeman, flagged him down to inquire if Bruton had left the east switch lined for the passing track. Birdwell was then standing north of, but near, the passing track at a point between the east switch and the place where Collins

and Simpson were to be picked up. The reason for Birdwell stopping Bruton was that Birdwell knew the engine and cars were not going out from the rice mill track through the east switch but on the other hand through the west switch. After the conversation in which Bruton assured Birdwell that he had left the east switch lined for the passing track, Bruton started the motor car up. Just at this time and after Birdwell had taken only about two steps back toward where he was working, Birdwell shouted to Bruton, "Stop—switch lined up against you—that switch is against you—watch it." But because of the noise of the motor car and racket from the rice dryer, Bruton did not hear the warning though it was heard by Guzman.

When originally constructed, both the east and west switches were equipped with targets. These are the usual switch targets observed on first-class railroads generally. They are visible from a considerable distance and their purpose is to indicate for which track switches are lined. On the day of the accident, the target on the east switch was intact, working and visible, but that on the west switch where the derailment occurred had rotted off and had not been replaced. Up until about April of 1952, the maintenance of the target on the west switch was Mr. Bruton's responsibility as this switch was in the section to which Bruton was then assigned. The evidence indicates the switch target rotted off during Mr. Bruton's tenure. But in April of 1952 Mr. Bruton was assigned to the 10 mile section to the east of that in which the west switch was located and more than six months had intervened thereafter before October 30, 1952, the date of the derailment made the basis of this suit.

Rule 94 governing operation of motor cars prohibits them being run more than 15 miles per hour. Another rule also applicable to the operation of motor cars requires the operator to run slow in going over switches and to carefully observe the position of switches.

When the west switch was opened by Brakeman Thorne to the rice mill track and

placed closed to the passing track, it was contemplated that it would be from 10 to 20 minutes thereafter before the actual movement of the cars on the rice mill track through the switch would be made. It would take that much time to couple the cars and connect the air hoses.

The evidence establishes that the switching "operation" involved commenced when the engine was detached from Local 95 on arrival at Katy and that it continued while the cars on the rice mill track were being assembled and up until they and the engine were coupled to the main body of the train where it stood on the main line and the train was thus made ready to leave Katy and proceed eastward toward Houston.

Mr. Schaller, defendant's superintendent of the division, testified by way of interpretation of Operating Rule 104 that during the entire time switching "operations" were in progress it was permitted to leave industrial track switches closed to superior passing tracks and unguarded. But the witness admitted on cross-examination, in effect, that his interpretation was not to be reconciled with the literal wording of the rule and that under the literal wording of the rule passing track switches are required to be kept lined in normal position, i. e., open to the passing track and closed to industrial and spur tracks "except while movement through them is being made." Of course, a common sense interpretation would require a switch to be thrown at least immediately preparatory to making an actual movement through it.

Based on the rules, the circumstances as he observed them, and the more usual method of switching rice mill track cars solely through the east switch, plaintiff testified he had no reason on the occasion in question to anticipate the actual position of the west switch as he approached it. He further testified to a careful lookout, despite which he failed to observe that the west switch was set against the passing track. His explanation was that grass had grown up around the switch which made it difficult to observe the switch points. Bruton also denied having heard an additional

warning given him by Guzman as the motor car approached the west switch. He said the noise prevented him hearing this warning.

Material jury findings were:

(1) Defendant was actionably negligent in opening the west switch at the time it was opened.

(2) Defendant was actionably negligent in leaving the west switch closed to the passing track at a time when cars were not passing through the switch.

(3) The absence of a target on the west switch resulted from defendant's actionable negligence.

(4) Defendant through its employee at the scene was not negligent in failing to close the west switch to the rice mill track *after observing* the approach of Bruton to the west switch along the passing track.

(5) Defendant's employees at the scene of the accident failed to give Bruton adequate warning of the position of the west switch but such failure was not negligence.

(6) Prior to the accident the defendant had not permitted grass to grow "around *and over* the west switch points."

(7) Plaintiff did not hear audible warnings attempted to be given him by Brakeman Birdwell and Tom Guzman of the position of the west switch.

(8) Plaintiff negligently failed to keep a proper lookout as he approached the west switch. This was a, but not the sole, proximate cause of the accident.

(9) Plaintiff did not violate Rule 94 by operating the motor car at a speed in excess of 15 miles per hour nor was he otherwise negligent in operating the motor car at an excessive speed under the circumstances.

(10) Plaintiff did violate Rule 95 which requires position of switches to be carefully observed as they are approached and also requires switches to be approached slowly. This violation was a, but not the sole, proximate cause of the accident.

(11) Plaintiff's failure to apply the brakes on the motor car was not negligence.

(12) The accident was an avoidable one.

It is defendant's position that the foregoing facts conclusively negative any breach of duty to plaintiff by defendant in the admitted master and servant relationship. Defendant concedes that the master owes the servant a duty to use ordinary care in the light of surrounding circumstances to furnish the servant a safe place to work; and defendant would not deny a similar duty resting on the master in the case of a complicated and dangerous business such as railroading to make, promulgate and enforce reasonable rules for the safety of employees.

Defendant seeks to support its position by analogy to the so-called "section hand" doctrine under which it is held there is no duty on the part of train operatives to keep a lookout for track workers, including section men, on motor cars, who are casually on the tracks from time to time and who are required by rules of their employment to protect themselves against the movement of regularly scheduled trains while proceeding, either on or behind time, on their accustomed tracks. The doctrine grows out of the practical necessities of railroading. It had but little significance when under the law contributory negligence of a track worker railroad employee was a complete bar to recovery. This is so because almost every injury to a track worker operating under rules requiring him at his own peril to protect himself against moving trains resulted from the track worker's own negligence. At any rate, the obligation of the track worker to protect himself against regularly scheduled train movements is held to entitle the train operatives to assume that he will do so to the extent of relieving such operatives of all duty to keep a lookout for the track worker. The rule has many exceptions and does not apply in the case of track workers on or about the track in places and at times where and when train operatives have good reason to expect them

to be; nor does the rule relieve of a duty to warn when the presence of a track worker on or near the tracks is actually discovered and the train operatives have reason to believe the track worker is unaware of the approaching train and is thus in a position of peril. We do not consider the rule applicable by analogy, as contended by defendant, to the instant facts. Rather, we feel the trial court properly permitted the jury to resolve the issues of the existence and breach of duties vel non as negligence both primary and contributory on the evidence. Though in tort cases under Texas law, at least, foreseeability is an element both of duty and proximate causation, this is without metaphysical and philosophical distinction between the existence of duty and causation through its breach. City of Dallas v. Maxwell, Tex.Com.App.1923, 248 S.W. 667, 27 A.L.R. 927, opinion approved by the Supreme Court. We feel that the trial court's submission in the time honored way, which included the element of foreseeability in the definition of proximate cause only, was entirely proper. But this does not answer defendant's contentions that it was under no duty to plaintiff not to open the west switch when it did and leave it open for the ensuing 10 to 20 minutes while the train crew was preparing the cut of cars on the rice mill track for movement through the switch, nor its contention that defendant owed Bruton no duty to have a target on the west switch to warn Bruton that the switch was set against him. These contentions are based on a claim that there was no reason for defendant to anticipate injury to plaintiff on account of either of these matters. These contentions seem to assume that plaintiff, a section foreman, operating a motor car, had no right to rely on the safe track doctrine and that he was bound to know at his peril before going over the switch in question that he could safely do so. Predicated on this assumption, defendant argues as a matter of law that Bruton's failure to ascertain before attempting to go over the switch that it was set against him was negligence and that such negligence was also as a matter of law the sole proximate cause of the derailment.

As we have indicated, we overrule these contentions.

We know of no rule of law, nor are we cited to any, which would relieve defendant of its nondelegable duty to use care to furnish Bruton a safe place to work and safe instrumentalities, including a safe track, for his use in performing his work. That employee operators and occupants of railroad motor cars are entitled to rely on the safe track rule and particularly on switches not being left open and unguarded as they proceed along the railroad track, has been held by the Fifth Circuit. See Wiggins v. Powell, 5 Cir., 1941, 119 F.2d 751, 754, certiorari denied 314 U.S. 649, 62 S.Ct. 94, 86 L.Ed. 520, where the court said:

> "The defendant railroad was guilty of negligence in leaving the Lake Charm switch open and unguarded against the main line, and it is clear that but for the open switch the motor car would not have been derailed, and Wiggins [a section foreman and a passenger on the motor car] would not have been injured."

█ This is a plain statement of law by a Federal court in an action under the Federal Employers' Liability Act, from which it necessarily follows that section men when operating motor cars are entitled to the benefits of the safe track rule. See also Jenkins v. Wabash Railway Co., 1937, 232 Mo.App. 438, 107 S.W.2d 204, and 1934, 335 Mo. 748, 73 S.W.2d 1002, an earlier opinion in the same case.

█ We hold that the evidence, including operating rule 104, looked at most favorably from plaintiff's standpoint, fully supports the jury's findings that defendant, its responsible agents, servants and employees, were guilty of actionable negligence in the respects established by the jury verdict. That the situation was a dangerous one is not to be denied unless one accepts the contention of the defendant, which we reject, that the proof established an absolute duty on the part of Bruton, while operating his motor car, not to go over any switch on a passing or main line track without first determining by any and every means necessary that the movement could be made with safety. We feel defendant's contention is refuted by much evidence in the record, illustrative of which we quote the following from the testimony of head brakeman Birdwell in regard to the warning he attempted to give Bruton:

"Q. Why did you tell Mr. Bruton this west switch was open? A. Well, I didn't want him leaving that line for the passing track.—I didn't want—

"Q. You didn't want him to run through it? A. No, sir.

"Q. You knew he was headed that way? A. Yes, sir.

"Q. You were afraid if you didn't tell him about it he would run through it? A. It was a possibility.

"Q. You left it—you felt it was advisable to give him some warning of it? A. Yes, sir.

"Q. Speak out. You know from past experience that Mr. Bruton expected in the line of all probability that you wouldn't change that switch at all but operate out of the east switch? A. That's the usual way we did it.

"Q. You had seen Mr. Bruton out there before? A. Yes, sir.

"Q. You were afraid that he would assume that you were going to do it the way you usually did it? A. I guess so.

"Q. A switch, under the rules and regulations, must be lined to protect the superior line? A. When it is not in use?

"Q. Yes. And, you as a railroad man, rely on tracks being left that way? A. Yes, sir.

"Q. When you are coming down a passing track or main line you expect that every switch will be lined up right? A. We expect them to but they are not always.

"Q. That would be a violation of the rules? A. Yes, sir."

 In respect to defendant's contention the plaintiff's own negligence in failing to keep a proper lookout was the sole proximate cause of the accident, we are convinced under the record that the jury was entitled to find as it did that such negligence was only a concurring cause which combined with that of defendant to produce the derailment. Had the switch not been opened before the train crew was ready to make the actual movement through it, the accident would not have happened. It may not, and the jury found it would not, have happened had there been a target on the switch to warn Bruton of its position as he approached. This finding is not unreasonable; under the evidence the question is one on which reasonable minds could differ. Primary and contributory negligence are not mutually exclusive in the chain of proximate causation. They may and often do concur, as found by the jury here to combine the links of the chain.

By its point 10, defendant complains of plaintiff having been permitted to introduce in evidence Rules 40, 757 and 760 of the "Rules of Maintenance of Way and Structures." Appellant itself later offered in evidence these same rules and all other "Rules for Maintenance of Way and Structures." Additionally, defendant fails to show any prejudice from the admission of the rules.

By its point 11, defendant complains of Bruton being permitted to testify that a new rule book contained a rule requiring track cars to be flagged the same as trains. The objection was that the rule book would be the best evidence. By its point 12, defendant contends it was error for plaintiff's counsel to propound the following question to plaintiff: "Where would this flagman who would warn you of such a dangerous situation such as an open switch stand?"

The points are but scarcely briefed. The errors, if any, are clearly nonprejudicial, under such Supreme Court cases as Den-

bow v. Standard Acc. Ins. Co., 143 Tex. 455, 186 S.W.2d 236, construing the harmless error rule, especially since no issue of liability was submitted to the jury based on the evidence complained of.

Affirmed.