Thomas J. CHOISSER, Appellant,

v.

Grady RAMEY et al., Appellees.

No. 3499.

Court of Civil Appeals of Texas.

Waco.

May 15, 1958.

Rehearing Denied June 26, 1958.

Combs & Mitchell, Houston, for appellant.

Baker, Botts, Andrews & Shepherd, Houston, for appellee.

TIREY, Justice.

Appellant, plaintiff below, grounded his cause of action on injuries resulting from an automobile collision; that such injuries resulted as a direct and proximate result of the negligence of appellee in operating his automobile. When plaintiff rested his cause, defendants seasonably moved the court to instruct a verdict in their behalf or to withdraw the case from the jury and render judgment in their behalf. These motions were sustained and the case was withdrawn from the jury and judgment was rendered that plaintiff take nothing. The plaintiff seasonably filed his amended motion for new trial, and, it being overruled, he perfected his appeal to the Houston Court of Civil Appeals and the cause is here on transfer order of our Supreme Court.

The judgment is assailed on three points. They are substantially to the effect that (1) the court erred in granting appellee Ramey's motion for an instructed verdict and in rendering judgment thereon for the appellees on the theory that appellant was a guest in the Ramey automobile, rather than a passenger within the meaning of Art. 6701b, Sec. 1, Vernon's Annotated Civil Statutes; (2) because the court held there was no evidence, or the evidence was insufficient, on the issue of negligence on the part of appellee Ramey which proximately caused the injuries complained of by the appellant; and (3) in granting the motion of appellee Texas Sporting Goods Company for an instructed verdict and rendering judgment thereon as stated in Points 1 and 2, and on the further ground that there was no evidence, or insufficient evidence, that Ramey was an agent or employee of the Texas Sporting Goods Company, acting within the course and scope of his employment at the time of this collision.

Testimony was tendered to the effect, and without dispute, that Tom Choisser met Grady Ramey, one of the appellees, in 1945, and at that time Ramey operated a sporting goods business in Lake Charles, Louisiana, and that Choisser lived in Sulphur, Louisiana, where he was engaged in the used car business. These men were avid outdoorsmen and they soon formed a close personal friendship, based on their common love of hunting and fishing, and they became frequent fishing and hunting companions. Ramey went to work as a salesman for Texas Sporting Goods in about 1948 and moved to Houston. After that he spent most of his time on the road as a salesman, in the area between Freeport, Texas and Lake Charles, Louisiana, and he was able to return to Sulphur regularly. It appears that appellant and appellee contacted one another every time appellee came to Sulphur, and on nearly every visit they would go hunting or fishing. It had been a common occurrence since appellant and appellee became friends for appellant to have appellee for dinner at his home, and appellee, on several occasions, took appellant and his wife to Lake Charles for supper. It also appears that Ramey was a widower and never had an opportunity to take Choisser to his home because he roomed out. Testimony was tendered to the effect that appellant would do anything he could to help appellee in his business, and that appellant knew that appellee would send him prospects to buy his cars if he could; that long prior to this accident their mutual friendship was such that each would help the other if he could, and there was no thought that either was trying to use the other. Each friend was willing and happy to put in a good word for the other one; that long prior to the fishing trip in question Ramey had mentioned to appellant that he would like to have the Stine account and Choisser had assured him that he would do what he could in this regard. Stine was a rice farmer and landowner and part owner of a private hunting and fishing paradise known as "Gum Cove," located about 15 miles out of Sulphur, Louisiana, and appellant first met Stine in the early part of 1940, and appellee met him in about 1944; that both appellant and appellee became close and fast friends with Stine, and Stine had often invited them to Gum Cove to hunt and fish with him. The relation between Stine and appellee was such

that appellee was socially welcome in Stine's home. In Stine's rice farming enterprise, he used shotgun shells in quantity, approximately $1,500 to $2,000 worth of shells per year, and appellee was interested in getting this business, if he could. As early as 1952, appellee sold Stine three or four shotguns, and in August of 1953 Stine began giving appellee part or all of his shell business each year. On each occasion the order was placed after appellee had approached Stine. While at Gum Cove, sometime prior to 1951, appellee and Elton Bordelon, one of Stine's longtime hunting and fishing companions, became acquainted, and Bordelon quite often acted as guide and duck caller for various hunting trips that Stine planned for his friends, and was repaid only by a warm and continuing friendship with Stine, and an opportunity to engage in a sport that he loved. Nick Barquet came to Sulphur in about 1950 as Manager of a branch office of a bank, and thereafter met Stine, Bordelon, Choisser and appellee. Barquet became a frequent hunting and fishing companion of Stine, and the appellee was a frequent guest of appellant and Stine, as well as other folks around Sulphur who liked to hunt and fish. On one or more occasions appellee had gotten sporting equipment for Barquet at wholesale price. Some weeks prior to January 3, 1953, Stine and Bordelon decided to attend a world's championship wrestling match in Houston. It appears that Barquet was invited to attend, as was appellant and appellee, and appellant and appellee were invited on a Sunday morning, while guests at Gum Cove. It appears that Stine wanted to go fishing on the same trip and that Ramey had been talking about the red fishing in Matagorda Bay, and Stine requested appellee to plan for them to go to Matagorda on a fishing trip. Appellee, living in Houston, agreed to pick up the tickets to the wrestling match on his return, and he did so. Appellant and appellee both testified that Ramey told appellant and Barquet that he was going to get the tickets to the wrestling match and, in return, wanted them to help him get the Stine account. However, Barquet recalled only

that appellee told him "at one time (that) he would appreciate anything I could do to help him and his firm about that particular order." On the day of the wrestling match, appellant, Bordelon, Barquet and Stine drove to Houston in Stine's car. It appears that from the time these parties left Sulphur to come to Houston there was no discussion of any business whatsoever. When the group arrived in Houston, they went to appellee's room and then next door to the home of Tommy Smith, one of appellee's friends. Smith was invited to the wrestling match, and his ticket was bought and paid for by appellee, and appellee also paid for supper for the entire group. Stine said that he accepted Ramey's picking up the tab the same way that Ramey accepted his hospitality, and felt that it simply showed "he was very nice." It appears that appellant and appellee, Stine, Bordelon, Barquet and Smith drove to the Houston coliseum, the scene of the wrestling match, in Stine's car. After the match they returned to Smith's home and discussed whether or not to take his boat, but decided not to do so. Appellant said someone said that Smith had better drive Stine's car, which he did, because Smith was familiar with the area, and that Ramey was going to drive his own car and had room for only one other besides himself, and that appellee asked Choisser to ride with him. It is also without dispute that appellant could have ridden in Stine's car, but he chose to ride with appellee, and explained the arrangement in the following words:

"A. Mr. Ramey asked me to ride with him. Mr. Ramey and I have been pretty close together in our connections. We have been more or less close together in all our operations. I was closer to Ramey.

"Q. So you got in the car with Mr. Ramey because you were probably a closer friend than any of the other group? A. Not closer friend, but closer related as friends.

"Q. You got in the car with Mr. Ramey at that time because you were

closer related than the other people? A. He and I were more intimate than the other folks," and

"Q. I mean the fact, just what I said, really, there is no difference, that is, you wouldn't have done any more or less for him if you had been in the Stine car, for example? A. I would do anything I could to help Mr. Ramey.

"Q. Whether you were in the Stine car or his car? A. That's right."

Testimony was tendered to the effect that because of rains in the area of Matagorda Bay, the water was muddy and appellee suggested that instead of their going to Matagorda Bay for the fishing that they go to Galveston and the party left Houston after the wrestling match; that appellant and appellee were riding toward Galveston on the Freeway at about 2:00 o'clock a. m., and that as they drove along at about 50 miles an hour, unknown to them, a car was parked on the highway on the other side of the crest of an overpass they were approaching. Appellant said that the car was 100 to 150 feet from the top of the overpass. There is an absence of testimony as to whether the moon was shining, but it was clear and the stars were shining. The testimony is to the effect that the parked car was visible to the appellee before he got to the top of the overpass. There were no lights on the parked car and its presence was not anticipated nor foreseen. Evidence was tendered to the effect that an automobile traveling at a speed of approximately 50 miles per hour is traveling about 66.6 feet per second, and there was testimony that appellee had approximately two to two and one-half seconds from the time he could first see the parked car until he reached it in which to act, and that after observing such situation there is a reaction time before any evasive action can be taken.

Appellant also testified in part:

"Q. Your idea is that when he drove over the overpass and charged down on it he didn't have any regard for his own safety or yours either? A. No, I don't think that.

"Q. Do you think he was heedless and reckless of your welfare? A. No, I don't think he was heedless or reckless of my welfare. I don't think his reaction was what he should have done to avoid the accident.

"Q. With the benefit of hindsight you are now about to say that if he had to do it over again, or if you had been driving, you would have done something else? A. Yes, if I had been driving we wouldn't have had the accident.

"Q. You are not, however, complaining of anything Mr. Ramey did up until the point where he said there was a car in the road indicating that he saw the car? A. I had no occasion to complain up to that time.

"Q. As you drove over that overpass that evening, Mr. Choisser, and he said there was a car in the road, and you looked up and saw it, your recognized that was an emergency situation, and there had to be something done, didn't you? A. Mr. Watkins, had I been driving I would have known what should be done.

"Q. That isn't my question. My question was,— A. (Interrupting) Mr. Ramey was driving the car, you understand.

"Q. When you drove over the overpass and saw the car there you recognized it to be an emergency situation, as we demonstrated yesterday, with two and a half seconds to use. You recognized that to be a situation where something had to be done and done quickly, didn't you? A. Yes, I imagine so.

"Q. And it was an emergency that came, of course, very suddenly. It wasn't something you had known about

formerly? A. You know that we didn't know that. * * *

"Q. Now, since this accident you still hunt and fish with Mr. Ramey? A. That's right.

"Q. He is still your friend? A. I thought so. I certainly thought so.

"Q. And you think so now? A. I'm beginning to doubt it a little bit now.

"Q. The night you were riding to Galveston in that car, you don't remember from the time you left Houston, just take that part of the trip, you don't remember any discussion with Mr. Ramey about business, do you, sir? A. I don't remember what we discussed at all. * * *

"Q. Well, the truth of the matter is, isn't it, Mr. Choisser, that you wouldn't have done any more or any less for your friend Grady Ramey if you had been riding in the car, or riding in Stine's car, or had to walk down there? A. What do you mean by that?

"Q. I mean the fact, just what I said, really, there is no difference, that is, you wouldn't have done any more or any less for him if you had been in the Stine car, for example? A. I would do anything I could to help Mr. Ramey.

"Q. Whether you were in the Stine car or his car? A. That's right."

Testimony was tendered to the effect that skid marks were shown on the highway and that the right front part of appellee's car hit the parked car that the Negroes were in. Appellant further testified in part:

"Q. All right, you got down to the overpass and the first inkling you had of danger was when Mr. Ramey yelled, or said something about the car in the road? A. That's right.

"Q. And, if I understand you right, you said you just continued on? A. Well, after he had told me there was a car in the road he said, 'Brace yourself, we are going to hit.'

"Q. I mean by that, sir, simply this. He applied his brakes almost instantly when he said there was a car in the road, didn't he? A. That, sir, I don't know.

"Q. Anyway, you jerked up to attention when he said he saw the car? A. That's right.

"Q. And I believe you told Mr. Combs that at that time the car was completely visible? A. That's right.

"Q. Of course, it had already become visible to Mr. Ramey because he had already told you it was there? A. When he told me it was there, it was visible, that's right.

"Q. I would like for you to tell me, Mr. Choisser, when Mr. Ramey put his brakes on the best you can recall. A. Mr. Ramey must have put his brakes on before he hit the car. I don't know. I was carried away from the wreck, but I understand there were skidmarks on the back on the pavement. If that is the case he must have put his brakes on.

"Q. Did he put them on when he said, 'There is a car in the road' or when he later on said, 'Brace yourself'? When did he put them on? A. That, sir, I couldn't tell you.

"Q. Well, just to refresh your recollection about it I am going back to your deposition, Mr. Choisser. On Page 31 I asked you the question, 'All right, sir. Then when you got down by LaMarque you came up this incline of this overpass?' And, you answered, 'That's right.' 'Q. All right, sir, taking it at that point, would you tell me in your own words what happened, how the accident occurred?' And your answer, 'Well, we hadn't been talking much, it was late and we were driving

down there. And it was the first time I had been over the freeway and I didn't know the road. When we went over the overpass, I might have been dozing a little. I don't know that I wasn't. But he said, look out. There is a car up the road. And, of course, when I raised up I saw the car and I tried to brace myself. And the next thing was the accident.' And, I asked, 'I see. All right, sir. Now, where was this other car located in relation to the incline of the overpass?' 'A. Well, I would say that he was approximately, oh, 100–150 feet further than the overpass.' 'Q. In other words, on the reverse side?' 'A. On the Galveston side going down.' 'Q. On the Galveston side of that incline?' 'A. That's right.' 'Q. Was this other car?' 'A. That's right.' 'Q. And your estimate is—and it is only an estimate I understand—' 'A. That's right.' 'Q.—that he was 100–150 feet down over the crest of the overpass on the Galveston side?' 'A. You understand, sir, after this accident, they took me to the hospital. And I have no way of checking a thing after that.' 'Q. I appreciate that. But you just told me—and I appreciate it is only an estimate—' 'A. That's right.' 'Q. —you believe he was approximately 100–150 feet on the Galveston side of that incline?' 'A. I think so.' Then I asked you, 'Now, you told me Mr. Ramey at one point said to you, "look out, there's a car up there", or something like that?' 'A. That's right.' And then I asked you, 'Was that just as you topped out over the overpass, or where was it, do you have any estimate to give me about it?' And you answered, 'Well, it must have been after we went over the top to see the other car.' That was your testimony in August of last year? A. That's right.

"Q. It was true then, and, of course, it is true now? A. That's right, sir.

"Q. Continuing on, I asked you, 'All right, sir. I believe you told me you just had time to or did you brace yourself and you hit the other car?' And your answer, 'That's right.' 'Q. Now, when he called your attention to the other car, did you immediately look ahead and look for it, or do you recall?' And you answered, 'Well, I guess I looked up. That's—I imagine when he said that, that I did look up. I remember seeing the back of the car.' And my question, 'All right, sir, did it have any lights on? It didn't did it?' And your answer was, 'That I don't know.' Then I asked you, 'All right, sir, did you see any lights?' 'A. I don't believe.' Then I asked you, 'All right, sir. Did Mr. Ramey immediately apply his brakes, or what was his reaction?' And you said, 'Yes, sir. Instead of going around the car on either side he did—he applied his brakes, and just slid into the back of the car.' That was your testimony in August? A. That's right.

"Q. And it is your testimony now? A. That's right.

"Q. That is the truth about how this matter happened? A. That's right."

■ Since the trial court gave an instructed verdict in this cause, we think the rule stated in Olds v. Traylor, Tex.Civ. App., 180 S.W.2d 511, 514, points 8 and 9, writ ref., is applicable here. It is: "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn

from the facts proved, a jury might have found in favor of the plaintiff.' "

In Wells v. Texas & Pacific Coal & Oil Co., 140 Tex. 2, 164 S.W.2d 660, 662, our Supreme Court made this statement of the rule: "It is familiar law that negligence is never presumed, and that the mere happening of an accident is no evidence at all of negligence."

In Rankin v. Nash-Texas Co., 129 Tex. 396, 105 S.W.2d 195, 199, our Supreme Court made this statement: "The occurrence of an accident or a collision, is not of itself evidence of negligence."

In Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791, 794, our Supreme Court makes this statement of the rule: "It was held in the case of Fort Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S.W. 1130, 1132, that 'a presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. "No inference of fact should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were the facts in issue. One presumption cannot be based upon another presumption." ' " (Citing cases)

█ We think the first major question to be decided is whether or not appellant was a guest in appellee's car at the time of the accident under the express provisions of Art. 6701b, Sec. 1, V.A.C.S. Much has been written on the foregoing statute and we think that perhaps the leading cases in Texas construing this statute are Rowan v. Allen, Tex.Com.App., 134 Tex. 215, 134 S.W.2d 1022 (opinion by Chief Justice Hickman, adopted by S.Ct.); Henry v. Henson, Tex.Civ.App., Texarkana, 174 S.W.2d 270 (writ ref.) and Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194. See also Linn v. Nored, Tex.Civ.App., 133 S.W.2d 234 (woj); Glassman v. Feldman, Tex.Civ.App., 106 S.W.2d 721; Raub v. Rowe, Tex.Civ.App., 119 S.W.2d 190 (writ

ref.). See also Whittenberg v. U. S., D.C., 148 F.Supp. 353. The foregoing cases and the authorities there cited clearly express the views of our Supreme Court and the application to be made of this statute. Each of the foregoing opinions has clarity and we think the pronouncements there made can be easily applied to the factual situation here before us.

We have summarized and set out the testimony tendered in such detail that we think it is obvious under the foregoing decisions that appellant was a guest and therefore his right to fix liability against appellees must be governed by the express terms of the foregoing statute.

█ If we be mistaken in our views to the effect that appellant was not a guest in appellees' car but was on the contrary a passenger, then in that event we are still of the view that he failed to tender an issue of negligent conduct on the part of appellee immediately prior to and at the time of the accident. In the case of City of Dallas v. Maxwell, Tex.Com.App., 248 S.W. 667, 670, 27 A.L.R. 927 (opinion approved by S.Ct.), we find this statement: "In this state it is now a settled doctrine that anticipation of consequences is a necessary element in determining not only whether a particular act or omission is actionably negligent, but also whether the injury complained of is proximately caused by such act or omission. (Citing cases, among them Texas & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S.W. 162). This doctrine is the result of an effort by the courts to avoid as far as possible the metaphysical and philosophical niceties in the age-old discussion of causation, and to lay down a rule of general application which will, as nearly as may be done by a general rule, apply a practical test, the test of common experience, to human conduct when determining legal rights and legal liability. Actual anticipation is of course not in any sense the test; but what one should under the circumstances reasonably anticipate as consequences of his conduct."

Going back to the undisputed record tendered by the evidence, it is to the effect that appellee was driving his car immediately before the accident at a rate of speed of about fifty miles per hour; that as he came to the crest of the overpass his lights and his vision picked up the car immediately in front of him some 100 to 150 feet ahead; that he immediately called to appellant that a car was in front of him and to brace himself and that he immediately applied his brakes and pulled to the left and that the car in front of him was without tail lights. There is no evidence that appellee failed to keep a proper lookout, nor that he failed to keep and maintain his automobile under proper and reasonable control, nor that he was driving his car on the occasion in question at a rate of speed greatly in excess of that at which a person of ordinary prudence would have operated his car under the same or similar circumstances. After all, appellant was on the freeway; it was in the morning; and he could not anticipate or foresee that a car would be parked without lights in the traffic lane ahead of him; nor is there any evidence that appellee failed to equip and maintain his automobile with reasonable and proper brakes and braking mechanism, and that the braking mechanism was not in proper order; nor is there any evidence that appellee failed to give the proper application of the brakes because the evidence is without dispute that the highway showed the skid marks; nor is there any evidence that appellee failed to swerve his car to avoid the collision. The evidence is undisputed that he did and that the right front part of his car struck the rear of the truck.

Both appellant and appellees have cited us to some very interesting out-of-the state cases, among them being, Goldberg v. Cook, 206 Minn. 450, 289 N.W. 512; Kruy v. Smith, 108 Conn. 628, 144 A. 304; Mitchell v. Heaton, 231 Iowa 269, 1 N.W.2d 284, 138 A.L.R. 832; Van Auker v. Steckley's Hybrid Seed Corn Co., 143 Neb. 24, 8 N.W. 2d 451; Zaso v. DeCola, 72 Ohio App. 297, 51 N.E.2d 654; Audia v. DeAngeles, 121 Conn. 336, 185 A. 78; Chaplowe v. Powsner, 119 Conn. 188, 175 A. 470, 95 A.L.R. 1177; Leete v. Griswold Post No. 79, American Legion, 114 Conn. 400, 158 A. 919. We have considered these authorities, but since we are bound by the pronouncements in Rowan v. Allen, supra; Henry v. Henson, supra; Burt v. Lochausen, supra; Whittenberg v. U. S., supra, and Rogers v. Blake, 150 Tex. 373, 240 S.W.2d 1001, further discussion of the cases would be of no avail.

Because of the views heretofore expressed, we think the trial court's action was correct, and its judgment is in all things affirmed.

HALE, J., took no part in the consideration and disposition of this case.