Juanita WILSON, d/b/a Burkeshire Courts, et al., Appellant,

v.

Geneva DUEVER et al., Appellees.

No. 14151.

Court of Civil Appeals of Texas.

San Antonio.

Nov. 20, 1963.

Rehearing Denied Dec. 18, 1963.

340 ■ ▬

Clinton G. Brown, Jr., San Antonio, for appellant.

Arch B. Haston, San Antonio, Kelly, Hunt, Cullen & Mallette, Victoria, for appellees.

POPE, Justice.

This suit was instituted by Geneva Duever, joined by her husband, David Duever, suing individually and as next friend for the use and benefit of Stephen Barnhart, her minor son, hereinafter referred to as Stephen, complaining of Juanita Wilson, a feme sole, doing business as Burkeshire Courts, for damages for injuries to Stephen, and expenses incurred in connection with such injuries. The injuries were received by Stephen when the defendant's employee was putting chlorine tablets into the skimmer of a swimming pool and suddenly this chlorine "back fired" out of the skimmer and got on Stephen. The trial was to a jury and resulted in judgment in favor of plaintiffs in the sum of $5,750.00, from which judgment Juanita Wilson, d/b/a Burkeshire Courts, has prosecuted this appeal. Appellant's only point is that the trial court erred in overruling her motion for judgment non obstante veredicto.

The jury found, among other things, that appellant (1) on the occasion of the accident, acting through Warren David Tuorila, failed to handle chlorine tablets in a safe and prudent manner, having due regard for the safety of customers on the premises, that such failure was negligence and a proximate cause of the occurrence in question, and (2) failed to maintain the equipment used to handle chlorine tablets on her premises in a reasonably safe condition with due regard for the safety of customers upon said premises, and that such failure was negligence and a proximate cause of the chlorine spraying up out of the skimmer, into which it had been placed, and injuring Stephen.

The evidence shows that appellant, Juanita Wilson, d/b/a Burkeshire Courts, maintained a swimming pool upon the premises of the courts for the benefit of her tenants. In addition thereto, the swimming pool was open to the public for a fee of fifty cents per person, and the public was invited

to use and enjoy the facilities provided at this price.

On May 20, 1961, Stephen, a minor twelve years of age, paid his fifty cents and was a guest and invitee at the swimming pool. Warren David Tuorila, also known as W. D., was a life guard and attendant at the swimming pool. W. D. discovered that it was necessary to add some chlorine to the water in the pool. He had everybody get out of the pool and began to add chlorine by placing chlorine tablets in what is called a skimmer from which the water would drain into and through the filter and thence be pumped back into the pool. After he had put some of the tablets of chlorine into the skimmer a mist was blown back through the skimmer and some of this mist went across the pool and got on Stephen and injured him. W. D. described how this happened in the following manner: After he discovered the need for more chlorine in the water he went up to the office and told them he was going to take everybody out of the pool for maybe fifteen or twenty minutes and not let anybody else in. He went back to the pool with his chlorine and got everybody out, and administered the chlorine, and then it blew back out of the filter. He put the chlorine "into the skim drain. It's the drain that's on the top, that the top water drains off into." W. D. further testified as follows:

"Q   Then what happened?

"A   And then the first dose went down okay, and the only thing I can figure out, that the dose that went down blew back up, but as I was fixing to drop a few more tablets down I heard water that sounded like it was rushing and fumes, water sprayed back out of the filter.

"Q   Was this water spray, how would you describe it? Was it a general mist, or was it a —

"A   It was just a general mist, yes, sir.

"Q   Did it seem to come out with great force?

"A   Yes, sir, it did. It was — it was back like a — just a back. It was just a back flush, that's what it was.

"Q   When you started to put this chlorine in was the pump running at the time?

"A   Yes, sir. It had to be.

"Q   You could hear it running?

"A   Yes, sir.

"Q   Well, after administering these — you say you put two, you put two applications of chlorine in there?

"A   Yes, sir. * * *

"Q   Did you hear the pump about this time? Did the pump stop or did it continue to run?

"A   It sounded like it was winding like a car will wind when you are at top speed.

"Q   I don't quite understand what you mean there. Do you mean a car with a low battery or something?

"A   No, sir. It sounded like it was pulling, had too much of a pull on it, or something.

"Q   Did the motor stop?

"A   It did temporarily, and then it started back up. Just an overload. * * *

"Q   W. D., had you ever had any experience or any difficulty with this filtering system, or this pump, at the pool before?

"A   Getting stopped up quite a bit. That was because of the amount of people that was in it. The lint and filter and stuff that was on it.

**342**

"Q How often did that occur?

"A We might have to clean it out once a week or something like that.

"Q Had you ever had any experience with the pump stopping before or slowing down, like you said it was doing?

"A No, sir, none at all. * * *

"Q Had anything like this backfiring of this water and chlorine ever occurred before there while you were present?

"A Not while I was present, no, sir. * * *

"Q Have you ever complained to Mr. Wilson about this pool, or this pump, or anything about it at all?

"A I told him there was too many people in the pool for the pump to handle."

The witness George Hagy, Jr., testified that he was in the pool service, repair, and maintenance business, that he had been in the pool business for about eight or nine years and had never heard of anything happening such as was described by W. D. There was no evidence that such an occurrence had ever happened before. Hagy further testified that W. D. by removing the cover and putting the chlorine tablets into the skimmer was following the usual and customary method of putting chlorine into the water in the swimming pool. The evidence shows that there was no inherent vice in the chlorine tablets.

It appears that Mrs. Wilson was the proprietor and operator of the swimming pool, Stephen was her business invitee and was injured in the manner set forth above. The question is, Did Mrs. Wilson owe Stephen the duty to guard against his being injured while upon her premises, in the manner in which he was injured? It appears to us that she owed no such duty.

In the very recent case of Halepeska v. Callihan Interests, Inc., Tex., 371 S.W.2d 368, the Supreme Court, speaking through Justice Greenhill, stated:

"As stated by this Court in [Robert E.] McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954), it would be simpler and perhaps preferable to treat these matters under ordinary negligence and contributory negligence; and many Texas cases have been decided on that basis. This view is urged by many able scholars and text writers. But this choice was afforded this Court in McKee and rejected because of stare decisis; that is, that the concepts of 'no duty' and voluntary exposure to risk had theretofore become established in this State.

"The 'no duty' doctrine is this: the occupier of land or premises is required to keep his land or premises in a reasonably safe condition for his invitees. This includes a duty of the occupier to inspect and to discover dangerous conditions. Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853 (1950); Genell, Inc. v. Flynn, 163 Tex. 632, 358 S.W.2d 543 (1962). His duty is to protect his invitee from dangers of which he, the occupier, knows, or (because of his duty to inspect) of which he should know in the exercise of ordinary care. If there are dangers which are not open and obvious, he is under a duty to take such precautions as a reasonably prudent person would take to protect his invitees therefrom and to warn them thereof."

■ The trial court submitted two items of negligence to the jury. In reply to Questions Nos. 1 to 3, the jury found that Warren David Tuorila failed to handle chlorine tablets in a safe and prudent manner, having due regard for the safety of customers on the premises, and that such failure was negligence and a proximate cause of the injuries sustained by Stephen.

There is no evidence in the record to support these findings. W. D. testified that he simply placed a handful of chlorine tablets in the skimmer and then put some more in. There is no evidence that if he had laid these tablets in a lesser quantity or in a more gentle manner in the skimmer, the usual place of applying them, there would not have been any mist arising out of the skimmer. There is no evidence even suggesting that W. D. should have foreseen that his placing of the handful of tablets into the skimmer could cause the mist to shoot up out of the skimmer.

█ In answer to Questions Nos. 4 to 6, the jury found that on the occasion of the accident appellant failed to maintain the equipment used to handle chlorine tablets on its premises in a reasonably safe condition with due regard for the safety of customers upon the premises, that such failure was negligence and a proximate cause of the occurrence in question.

There is no evidence to support these findings. The occurrence in question, of course, is the mist shooting up out of the skimmer and getting on Stephen and injuring him.

If it may be said, under all of the facts in this case, that Mrs. Wilson, or her employee, W. D. Tuorila, knew, or after a careful inspection of the premises should have known, that there was danger of this mist shooting up out of the skimmer and getting on Stephen when W. D. placed the chlorine tablets in the skimmer, then she would have owed the duty to Stephen to protect him from or warn him of this danger.

█ The evidence shows that never before had such an unusual occurrence happened. There was nothing to show what caused the unexplained phenomenon. The only thing that W. D. could figure out was that the motor stopped and then started again, and that this might have caused the mist to arise from the skimmer. It is not shown that the motor or pump was connected in any way with the skimmer. The evidence vaguely shows that the top water drained into the skimmer and then through the filter; that after the water had thus drained through the filter it was sucked up out of the filter tank by the pump and forced back into the pool. The evidence does show that appellant had been told and she realized that the filter and pump were inadequate to keep the pool clean with so many people swimming in it, but there was nothing to indicate that by reason of the inadequacy of the filter and pump, chlorine spray might shoot up out of the skimmer. The only result of the inadequacy of the filter and pump was that the filter had to be cleaned of lint and other substances too often, and that it was not keeping the pool as clean as it should. There is nothing to show that any amount of inspection of the premises by appellant would have revealed the danger of chlorine mist spraying up out of the skimmer. Appellant had no knowledge of this danger and had no reason to believe it might happen, and therefore she owed no duty to Stephen to protect him from this chlorine mist.

To hold that appellant should have protected Stephen from the mist whether or not she knew or should have known of the danger, would be to hold the occupier of land liable for injuries sustained by invitees, though such occupier be without fault and fix his liability simply because he was the occupier of the premises. Camp v. J. H. Kirkpatrick Co., Tex.Civ.App., 250 S.W.2d 413.

In Corpus Christi Speedway, Inc. v. Morton, Tex.Civ.App., 279 S.W.2d 903, the plaintiff was driving in an automobile race on defendant's race track when his car was in an accident. He got out of the car and was hit by a bottle thrown from the grandstand. On his way back to get in his car, for protection from bottles, he was injured when his car was struck by another racing car. The trial court's judgment in favor of the plaintiff was reversed

and rendered in favor of the defendant by the Court of Civil Appeals. In its opinion by Justice Norvell, the Court said:

"However, although it appears that the track had been in operation some three years prior to appellee's injury, there was no evidence of a general fight or altercation having broken out among the spectators upon any occasion, nor was there evidence that any one had been hit with a bottle or that one had ever been thrown prior to the incident giving rise to this lawsuit.

" * * * In the present case, the throwing of the bottle is largely unexplained. No prior altercation or difficulty was shown. * * * With reference to a similar situation, the Supreme Court of Virginia, in Whitfield v. Cox, 189 Va. 219, 52 S.E.2d 72, 75, said:

" ' * * * The duty on the defendant was to use reasonable care to protect the plaintiff from dangers that could reasonably be anticipated. The evidence does not, we think, establish a breach of that duty or any causal connection between such an alleged breach and the plaintiff's injury.' "

In Houston Lighting & Power Company v. Brooks, 161 Tex. 32, 336 S.W.2d 603, the Court said:

"The record wholly fails to show any facts which would be a basis for holding that petitioner could reasonably anticipate the time for pouring concrete on top of the second floor. Of course petitioner knew the location of the lines in relation to the building, but since they were properly located in accordance with the National Electrical Safety Code the knowledge of such location in itself gave no reason to anticipate danger to respondent. Respondent wholly failed to establish any reason why petitioner should anticipate the injury of which he complains.

"If the reason to anticipate injury is not established, then no duty arises to act to prevent such an unanticipated injury. * * *

"There is no evidence that petitioner in this instance had actual knowledge of probable danger to respondent, and there are no facts in the record upon which to base constructive notice to petitioner. To hold petitioner liable under the facts of this case we would necessarily have to arbitrarily impute foresight to petitioner. It was said in Texas & Pacific Railway Co. v. Bigham, 90 Tex. 223, 38 S.W. 162, 163:

" ' * * * a party should not be held responsible for the consequences of an act which ought not reasonably to have been foreseen. * * * it would seem that there is neither a legal nor moral obligation to guard against that which cannot be foreseen, and under such circumstances the duty of foresight should not be arbitrarily imputed.'

"Also, it was said in the case of City of Dallas v. Maxwell, 248 S.W. 667, 670, 27 A.L.R. 927, (Tex.Com.App. opinion, approved by Supreme Court):

" 'In this state it is now a settled doctrine that anticipation of consequences is a necessary element in determining not only whether a particular act or omission is actionably negligent, but also whether the injury complained of is proximately caused by such act or omission.' "

See also Great Atlantic & Pacific Tea Co. v. Evans, 142 Tex. 1, 175 S.W.2d 249; St. Louis, S. F. & T. Ry. Co. v. Gore, Tex. Civ.App., 69 S.W.2d 186; McFerren v. Brae Burn Country Club, Tex.Civ.App., 274 S.W.2d 122.

The evidence in this case shows that the defendant was using the customary type of chlorine tablets to maintain her pool in a

sanitary condition; that these tablets in themselves were not inherently dangerous. That the life guard had checked the chlorine content of the pool and found it to be low. Based on this chlorine check, he knew that a certain amount of chlorine tablets were necessary to bring the chlorine count up to where it should be. The life guard had a tube or measuring device in which he measured out the necessary amount of chlorine tablets. He then took these to the pool and put some tablets in the skimmer and held them there by hand. The evidence further showed that this was the customary manner of administering chlorine tablets to a pool. After he had laid a few tablets in the skimmer he dropped a few more in, another application, and at that time there was a "kick-back" or back-flush, which was sudden, and which the witnesses stated was in the form of a mist. This back-flush or kick-back is entirely unexplained. All of the witnesses familiar with appellant's pool, as well as other pools, testified that they had never known of such a thing to happen previously. The pool service man, with eight or nine years experience in and around pools, stated that he had never known such a thing to occur.

Neither appellant nor W. D. had any way of knowing or anticipating that such an occurrence would happen; therefore, there was no legal or moral obligation on them to guard against it. Under these circumstances, the duty to foresee should not be arbitrarily imputed to appellant or to W. D. In other words, without such knowledge there is no duty, and consequently no breach of duty, and therefore no liability.

The trial court erred in not granting appellant's motion for judgment non obstante veredicto. The judgment of the trial court is reversed and judgment here rendered that appellees take nothing.

POPE, J., concurs in the result.